**Neil JOHNSTON, Plaintiff,**

v.

**TIME, INC., Arnold Red Auerbach and George Plimpton, Defendants.**

**No. C–49–WS–69.**

United States District Court,
M. D. North Carolina,
Winston-Salem Division.

Jan. 28, 1970.

On Motions for Summary Judgment
Nov. 23, 1970.

Weston P. Hatfield and Roy G. Hall, Jr., of Hatfield, Allman & Hall, Winston-Salem, N. C., for plaintiff.

Egbert L. Haywood, of Haywood, Denny & Miller, Durham, N. C., and Harold R. Medina, Jr., of Cravath, Swaine & Moore, New York City, for defendants.

## MEMORANDUM AND ORDER

GORDON, District Judge.

This is an action for libel brought against Time, Inc., Arnold "Red" Auerbach and George Plimpton, to recover damages allegedly resulting from an article in the December 23, 1968, issue of Sports Illustrated. A motion has been made by defendant, Time, Inc., a Delaware corporation, to dismiss the action for lack of jurisdiction over the person under Rule 12(b) (2) of the Federal Rules of Civil Procedure. Defendant, Time, Inc., was served with process under the provisions of North Carolina General Statute §§ 55–145 and 55–146 which allowed substituted service upon the Secretary of State of North Carolina. The pertinent part of G.S. § 55–145 reads as follows:

"(a) Every foreign corporation shall be subject to suit in this State, by a resident of this State or by a person having a usual place of business in this State, whether or not such foreign corporation is transacting or has transacted business in this State and whether or not it is engaged exclusively in interstate or foreign commerce, on any cause of action arising as follows:

\*　\*　\*　\*　\*　\*

"(2) Out of any business solicited in this State by mail or otherwise if the corporation has repeatedly so solicited business, whether the orders or offers relating thereto were accepted within or without the State; or

"(3) Out of the production, manufacture, or distribution of goods by such corporation with the reasonable expectation that those goods are to be used or consumed in this State and

are so used or consumed, regardless of how or where the goods were produced, manufactured, marketed, or sold or whether or not through the medium of independent contractors or dealers; or

"(4) Out of tortious conduct in this State, whether arising out of repeated activity or single acts, and whether arising out of misfeasance or nonfeasance."

■ The Court will use the method of analysis adopted by the Fourth Circuit in Bowman v. Curt G. Joa, Inc., 4 Cir., 361 F.2d 706 (1966) to determine the jurisdictional problem. Service was made in accordance with Rule 4(d) (7), Federal Rules of Civil Procedure, which provides that service on a foreign corporation may be made in a manner prescribed by state law. Therefore, according to Bowman, the matter should be viewed in two contexts: The first is a question of state law, i. e., whether the state has made provisions for obtaining jurisdiction of the foreign corporation in its own courts under the facts as they are presented by the matter being adjudicated. In this context, state decisions are binding on the district court. Secondly, if the State has purported to exercise jurisdiction, then the question of due process under the Fourteenth Amendment may arise. This being a federal question, state decisions are not controlling.

## STATE LAW

Defendant, Time, Inc., cites as a leading authority for its motion for dismissal, the North Carolina case of Putnam v. Triangle Publications, Inc., 245 N.C. 432, 96 S.E.2d 445 (1957). In that case a North Carolina resident sought to bring a libel action against the defendant, a Delaware Corporation, based on an alleged libel contained in Official Detective Stories magazine. A judgment was entered quashing the attempted service of summons and complaint upon the defendant and the plaintiff appealed. The North Carolina Supreme Court held

that attempted service under G.S. § 55–38.1 (now G.S. § 55–145) was not proper because of the lack of minimum contacts with the State. The court dealt primarily with the present G.S. § 55–145(a) (3) and stated:

"It would seem that the language of G.S. § 55–38.1(a), subsection (3), is broad and comprehensive enough to sustain the attempted service of process in this case, provided this section is constitutional as applied to the facts of this case." 96 S.E.2d at 453.

With reference to G.S. § 55–145(a) (4), the subsection upon which the plaintiff in this case bases his service, it was stated in *Putnam* that:

"In the instant case the defendant was not in the State of North Carolina, and had no minimum contacts with the State. To hold that G.S. § 55–38.1(a), subsection (4), applied to the facts of this case, would raise a serious question as to its constitutionality." 96 S.E.2d at 455.

Thus it appears that the North Carolina Supreme Court was concerned primarily in *Putnam* with the question of due process, and not with the question of whether the state statute did in fact encompass the fact situation before the court. There are marked dissimilarities between the fact situation presented to the North Carolina Supreme Court in *Putnam*, and the fact situation involved in the present case.

(1) Triangle publications had "some" North Carolina resident subscribers to "some" of its magazines. Time, Inc., had 28,200 North Carolina subscribers to Sports Illustrated on December 23, 1968, the date of the issue containing the allegedly libelous article, and on March 13, 1969 (five days before service was made on the North Carolina Secretary of State) Time, Inc., had 50,500 North Carolina subscribers to Time magazine, 117,862 subscribers to Life magazine, and 6,247 North Carolina subscribers to Fortune magazine.

(2) Triangle publications solicited subscriptions in the State of North Car-olina only by mail and by coupons attached to their magazines. Time, Inc., also carried out subscription solicitations in this manner; but additionally subscriptions were solicited on behalf of Time, Inc. by four independent college bureau representatives in North Carolina, seventy-two college bookstores in North Carolina, three or four non-college bookstores in North Carolina, independent agents who solicited through the schools in North Carolina, various sales corporations, some based inside and some outside the State of North Carolina, and newsboys in North Carolina.

(3) Triangle publications had "virtually no advertising from North Carolina. In 1968, Time, Inc. sold advertising space in its publications to twenty or more advertisers which reside or have their principal place of business in North Carolina. Sixty-six or more pages of advertising space were sold to these advertisers.

(4) Triangle publications did not solicit advertising within North Carolina. Time, Inc. occasionally had a manager or salesman from its New York, Georgia, or Florida office visit North Carolina for interviews with corporations which were considered to be possible advertisers.

(5) Triangle publications owned no property nor had control of any property within the State of North Carolina. Time, Inc. has a wholly-owned subsidiary, Eastex, Inc., whose products include paper and paperboard. Eastex, Inc. has a plant in Charlotte, North Carolina. Although a corporation cannot be doing business in a state through the presence of a subsidiary, this fact does merit some consideration in portraying the whole scope of the problem.

(6) Triangle publications, in its operation of Official Detective, used only free lance writers. Time, Inc., employs a large staff of writers, and George Plimpton, the author of the article containing the alleged libel, was on contract with Sports Illustrated.

(7) Triangle publications, in its distribution of Official Detective, used common carriers who were independent contractors, to deliver a large majority of the copies of the magazine. Time, Inc., whose magazine sales are carried out largely by subscription (94%), makes great use of the United States mails for delivery directly to the subscriber.

Bearing on the issue of whether North Carolina General Statute 55–145 would be applicable to the present fact situation, insofar as state interpretation is concerned, is the case of Painter v. Home Finance Co., 245 N.C. 576, 96 S. E.2d 731 (1957), which was decided twenty-six days *after Putnam* was handed down. The defendant was a South Carolina corporation which had allegedly wrongfully repossessed an automobile in North Carolina. The plaintiff brought this action in North Carolina and procured service under what is now G.S. § 55–145(a) (4) which deals with a tortious act committed in this state. Defendant's motion to quash service of process was denied and defendant appealed. The North Carolina Supreme Court affirmed stating that the mere fact that a tortious act was committed within the state by the defendant was sufficient under the statute to render the defendant amenable to the jurisdiction of the North Carolina courts. The opinion further stated that a finding that the defendant was "doing business" within the state was mere surplusage and not necessary for the purposes of the determination. In essence, the North Carolina Supreme Court held that the commission of a single tort was sufficient under the statute to grant jurisdiction.

A case helpful in making a ruling as to whether a tort was indeed committed in this state is Sizemore v. Maroney, 263 N.C. 14, 138 S.E.2d 803 (1964) which held:

"Unless otherwise provided by statute, libelous matter sent through the mails is generally actionable either at the place of posting or at the place of receipt by the addressee, even in another state, because libel actions are transitory in their nature. The rationale of the rule is that each time a libelous matter is brought to the attention of a third party a new publication has occurred, and that each publication is a separate tort. 53 C.J.S. Libel and Slander § 158; 33 Am.Jur., Libel and Slander, § 227. See Hartmann v. Time, Inc., 3 Cir., 166 F.2d 127, 1 A.L.R.2d 370, cert. den. 334 U. S. 838, 68 S.Ct. 1495, 92 L.Ed. 1763." 138 S.E.2d at 807–808.

■ Assuming for the purpose of making a ruling on the motion to dismiss for lack of jurisdiction over the person that the article contained in Sports Illustrated was libelous, there would have been a publication of the libel each time it was read in this State, and therefore a tortious act would have been committed in this State by Time, Inc., which would be sufficient under the mandate of Painter v. Home Finance Co., supra, to grant the North Carolina courts jurisdiction by virtue of G.S. § 55–145(a) (4).

### FEDERAL QUESTION

International Shoe Company v. State of Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945) is the leading case in this area of deciding whether the *in personam* reach of a state is in conflict with the due process clause of the Fourteenth Amendment to the United States Constitution. For a determination of this sort, the United States Supreme Court set out the following guideline:

"[D]ue process requires only that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" 326 U.S. at 316, 66 S.Ct. at 158, 90 L.Ed. at 102.

■ Numerous cases have been cited by both plaintiff and defendant in support of their positions on this motion to dismiss. But this is a unique area of the law in which there are few precedent-setting cases because the subject matter does not lend itself to broad, sweeping generalizations. The question of whether there are, in fact, sufficient minimum contacts with a territorial entity by a defendant must be determined by applying the fact situation before the court to the law as it has been set forth by the legislative and judicial authorities. But there are many distinctions which must be drawn and questions which must be asked—Did the case deal with a local newspaper or a national magazine? What was the geographical proximity of the states involved? What was the extent of circulation involved in the state in each case? How much advertising revenue was realized from the state? How were solicitations for new subscriptions handled?— These are just a few of the many interrogatories which must be made. What might be sufficient in one situation for the satisfaction of the due process requirement, might be summarily dismissed in another situation as unconstitutional. Time, Inc., argues that its contacts with North Carolina are miniscule when the entire operation of the corporation is considered; but the Court feels that this argument does not strike at the core of the problem of minimum contacts. While the forum state's impact upon the *defendant's business is a relevant factor* which cannot be overlooked, far greater weight should be given to the contact that the defendant's business has with the markets of the forum state. The latter is the crux of this jurisdictional investigation.

Defendant, Time, Inc., in their brief in support of the motion to dismiss for lack of jurisdiction over the person, cites three notable cases handed down by the Fifth Circuit Court of Appeals—Buckley v. New York Times Company, 5 Cir., 338 F.2d 470 (1964); Curtis Publishing Company v. Birdsong, 5 Cir., 360 F.2d 344 (1966); New York Times Company v. Conner, 5 Cir., 365 F.2d 567 (1966). Not cited by the parties in their briefs is the case of Curtis Publishing Company v. Golino, 5 Cir., 383 F.2d 586 (1967), a more recent decision than the aforementioned cases, written by Judge Thornberry (who was also the author of the New York Times Co. v. Conner decision), which deals extensively with the three cases above and distinguishes them from the fact situation presented by *Golino*. Because the problems dealt with in *Golino* are very similar to those now before the Court, it will be quoted from at length:

"The existence of a newspaper, no matter how popular, depends primarily upon circulation in the vicinity of its publication. * * * Such is not the case with a publisher of a national magazine. The primary function of such a business is to sell as many magazines as possible in every state of the union, and to that end the corporation actively directs its business. The publication itself, unlike a newspaper, is not prepared primarily for local consumption, but rather for a nationwide audience. Curtis would certainly not argue that the Saturday Evening Post is published for the consumption of readers in Pennsylvania, its place of publication, more than for those in Oregon, Illinois, or Louisiana.

"Any resolution of the issue before us must take into account these basic differences between the businesses of publishing a newspaper and a national magazine; and precedent dealing with one type of business should not control cases involving the other unless it can be shown that such an application supports the underlying constitutional policy. Thus, the language of *Buckley* relied upon by appellants must be viewed in its factual context and applied with the above admonitions in mind. Ignoring these considerations, appellant argues that the statement of the *Buckley* court quoted above stands for the proposition that circulation alone may *never* give rise to contacts

sufficient to satisfy the due process requirement. The logical defect in this interpretation can, however, be readily demonstrated. Under appellant's reading of *Buckley*, a national publisher would be allowed to insulate itself against suit in every state of the union except the state of publication. It could carry on all solicitation by mail or through independent distributors. The subject matter for its publications could be procured entirely through independent sources. By a proper degree of care, the publisher could eliminate nearly all physical contacts, other than circulation and correspondence, with all but one state. No doubt such a course would be motivated primarily by a desire to avoid legal actions brought in the other states where the publications were circulated. Clearly it would not comport with notions of fair play and substantial justice to allow a business enterprise, whose overriding business purpose is maximum exploitation of the national market, to be free from suit as a matter of law in all states but that of publication simply because physical contacts with the other states had been reduced to a minimum. The legal principle urged upon us by appellants would allow a publisher, fully aware of the strong possibility of resulting legal action, to print libelous matters directed at persons in distant localities, yet remain free from suit in such localities in spite of the pecuniary benefits gained in that very jurisdiction where it asserts it cannot be held legally accountable. A rule of law allowing such a condition would clearly not conform to the purposes behind the 'minimum contacts' due process requirement. Resolution of the due process issue in the field of extra-territorial jurisdiction involves consideration of many factors. Circulation is admittedly one of these factors when dealing with a national publisher, and we are unwilling to say with appellant that it can never be sufficient in itself to satisfy the con-

stitutional test." 383 F.2d at 590–591.

The facts in *Golino* are closely analogous to those before the Court. In *Golino*, the plaintiff brought his action against Curtis Publishing Company because of an allegedly libelous article contained in a 1964 edition of Saturday Evening Post. The plaintiff was a resident of Louisiana and brought his action in a United States District Court in that state. Curtis Publishing Company was a Pennsylvania corporation. The author of the article was an independent writer on contract with Curtis. There were no employees of Curtis in Louisiana soliciting subscriptions. An independent national distributor, not Curtis, sold all the newsstand copies of Saturday Evening Post. Curtis had no reporters or correspondents regularly assigned to Louisiana. Curtis had no advertising solicitors regularly assigned to Louisiana. For the years 1962–64 the average percentages of Saturday Evening Post's business in Louisiana was: (1) subscription circulation—.99%; (2) subscription revenue—.91%; (3) newsstand circulation—.87%; (4) newsstand revenue—.86%; and (5) advertising pages—.09%. Judge Thornberry, in summing up these facts, stated:

"The business activity of Curtis in Louisiana is calculated, ordered, and substantial. The fact that physical contacts are minimized through the use of independent contractors and distributors does not alter the basic existence of Curtis' involvement in, and its pecuniary benefit from, a full exploitation of the Louisiana market; nor does it remove Curtis' reliance upon the protection of Louisiana's laws. Curtis can reasonably anticipate that the sale, distribution, and promotion of its publications might entail libel actions, and that such actions will in all probability be brought at the places of residence of the parties alleging injury. Considering these factors, the requirement of defense in Louisiana in the instant case should not be viewed as a significant

inconvenience to Curtis. It is certainly not one that will hinder the flow of Curtis' publications into the state." 383 F.2d at 593–594.

■ On December 23, 1968, Time, Inc., had 29,865 copies of Sports Illustrated in the State of North Carolina. This, compared with a total distribution of 1,754,858 copies of Sports Illustrated, is 1.7% of the total circulation for that same date. Taking into account two variables which were noted in the *Golino* decision—(1) distribution that was made to markets outside the United States, and (2) the fact that circulation in the poorer sections will tend to lag behind areas of relative economic affluence—this figure of 1.7% compares favorably with the figure of 2.5% which is the percentage of North Carolina population as compared with that of the United States (based on the 1960 census.). Furthermore, during the week of March 13, 1969, Time, Inc., had distributed into the State of North Carolina 180,042 copies of its publications of Time, Life and Fortune (Sports Illustrated not included). The figure, 180,-042, encompasses both subscription and newsstand business. It is not reasonable to think that Time, Inc., would contend that 1.7% of its circulation for Sports Illustrated was not a substantial piece of the action, particularly when it comes from a state whose population represents only 2.5% of the total population for the United States.

"Circulation is the heart of the magazine publication business. It is to the end of increasing circulation that all other facets of the business are directed. It is also the activity from which the alleged injuries in a libel action flow. Where, as here, the solicited circulation of a corporation's publications account for a relatively significant portion of the corporation's revenue, notions of fair play and substantial justice support the right of the state to require the corporation to answer non-frivolous claims arising out of its contacts with the state, even though it has managed to reduce its physical presence in the state to a minimum." Curtis Publishing Company v. Golino, 5 Cir., 383 F. 2d 591–592.

This factor, along with other facts set forth in the distinctions which have been made between this present situation and Putnam v. Triangle Publications, *supra*, are sufficient to establish Time, Inc.'s presence within the State of North Carolina.

"'Presence' in the state in this sense has never been doubted when the activities of the corporation there have not only been continuous and systematic, but also give rise to the liabilities sued on, even though no consent to be sued or authorization to an agent to accept service of process has been given." International Shoe Co. v. Washington, 326 U.S. at 317, 66 S.Ct. at 159, 90 L.Ed. at 102.

Defendant, Time, Inc., further contends that because of the protection afforded it by the First Amendment, there should be required a greater showing of contact to satisfy the due process clause than is necessary in asserting jurisdiction over other types of tortious activity. Time, Inc., cited New York Times Co. v. Conner, 5 Cir., 365 F.2d 567 (1966) which supported this proposition "because of the inherent danger or threat to the free exercise of the right of freedom of the press if jurisdiction in every state can be inferred from minimal contacts." 365 F.2d at 572. Also cited by the defendant for the same concept is Time, Inc. v. Manning, 5 Cir., 366 F.2d 690 (1966), a case which held that Time, Inc., had sufficient minimum contacts with the State of Louisiana to satisfy the due process requirements of the Fourteenth Amendment. The *Manning* case dealt with patent infringement, not libel, and its statements concerning First Amendment protections were dicta.

Curtis Publishing Company v. Golino, *supra*, discusses the *Conner* case at length, and of some significance is the fact that Judge Thornberry wrote both decisions:

"Certainly the language in *Conner* does not stand for the proposition

that, because of the constitutional protection of the dissemination of ideas, a publisher may never be sued for libel in a state other than that of publication. Rather, *Conner* indicates that first amendment considerations are a factor relevant to a determination of the jurisdictional question; and, the discussion of that factor in *Conner* must be viewed in its factual context. As discussed at length above, there are significant differences between the business of publishing a newspaper and a national magazine, especially as to what degree the policies and activities of that business are influenced by circulation in areas far removed from the place of publication. When dealing with a newspaper, it is reasonable to assume that, due to the lack of substantial revenues derived from sales in distant forums, a strong possibility of lawsuits will have a chilling effect upon the desire of the paper to promote the distribution of publications expressing views unpopular in such forums. The same statement cannot be made concerning the business of a well-known, highly successful national magazine such as the Post. To argue that periodic lawsuits resulting from circulation of the Post will chill the desire of Curtis to actively encourage the widest possible circulation is clearly out ·of line with economic realities.

"We have taken into account the first amendment considerations as one factor in reaching our decision. *We do not, however, consider them controlling on the facts of this case.* We are convinced that suits such as the present one, unless assumed to occur in unrealistically large numbers, will in no way inhibit the zeal with which Curtis distributes its ideas." (Emphasis added) 383 F.2d 592.

The Second Circuit, through Judge Friendly, spoke to this issue and the problems raised by the *Conner* decision in Buckley v. New York Post Corp., 2 Cir., 373 F.2d 175, 20 A.L.R.3d 942 (1967):

"We are not sure whether the law made by these hard cases was good or bad. Newspapers, magazines, and broadcasting companies are businesses conducted for profit and often make very large ones. Like other enterprises that inflict damage in the course of performing a service highly useful to the public, such as providers of food or shelter or manufacturers of drugs designed to ease or prolong life, they must pay the freight; and injured persons should not be relegated to forums so distant as to make collection of their claims difficult or impossible unless strong policy considerations demand. * * * Hazards to publishers from libel actions have recently been much mitigated by the development of substantive principles under the First Amendment, notably in New York Times Co. v. Sullivan * * *. It is a legitimate question whether this will not sufficiently protect communications media without superimposing a necessarily vague First Amendment standard upon the application of long-arm statutes and thereby possibly creating undue hardship for a plaintiff * * *." 373 F.2d at 182–183.

The Court finds the discussions by Judges Thornberry and Friendly persuasive. Since 1967, the year both the *Golino* and the *New York Post* decisions were handed down, expansion has been made on the protection afforded publications as set forth in New York Times v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686, 95 A.L.R.2d 1412. Therefore, the necessity of granting the First Amendment a weighty consideration in the determination of whether a certain forum has jurisdiction over a defendant publisher is not as great as it was at the time that New York Times Co. v. Conner, *supra*, was handed down. The Court has not totally disregarded the First Amendment in this context, but the consideration given it here has been minimized. The First Amendment was

one factor taken into account in reaching this decision. But, even if it had been a weighty element, it would not have changed the result of this opinion. More than the bare essentials required by the "minimum contacts" rule w~re present. Time, Inc., has a substantial impact upon the market places of North Carolina.

Time, Inc., has also filed a motion to dismiss for failure to state a claim for which relief can be granted under Rule 12(b) (6) and a motion for summary judgment under Rule 56. These motions are denied without prejudice to Time, Inc., to renew them when discovery has been completed. To allow these motions before the completion of the discovery period would be untimely. Certain facts, or lack thereof, have to be shown before either of these motions can be granted. An opportunity should be given so that the factual situation can be presented to the Court with sufficient clarity, in order that a ruling may be made which is consistent with the cases arising under the First Amendment. Dodd v. Pearson, 277 F.Supp. 469 (D.D.C.1967). It is in this context, rather than in a jurisdictional arena, that the freedom of the press clause, and interpretations thereof, can be given their fullest weight. It is not the desire of the Court to establish a precedent which would have a chilling effect upon the exercise of a First Amendment freedom, and it is not felt that this decision will do so.

In the jurisdictional context, the defendant has the protection of the rights guaranteed to it by the due process clause of the Fourteenth Amendment and International Shoe Company v. Washington et al., *supra*. To interject the First Amendment, with its full impact, into the discussion at this point would unnecessarily confuse an already complex issue. To deny recovery to a plaintiff because of a constitutionally guaranteed right is one thing; to deny the plaintiff a forum when he has established his right to jurisdiction over the defendant under the Fourteenth Amendment is another.

Therefore, it is ordered that the motion by defendant, Time, Inc., to dismiss for lack of jurisdiction over the person under Rule 12(b) (2), Federal Rules of Civil Procedure, be and the same hereby is denied. .

It is further ordered that the motions by defendant, Time, Inc., to dismiss for failure to state a claim for which relief can be granted under Rule 12(b) (6), Federal Rules of Civil Procedure, and for summary judgment under Rule 56, Federal Rules of Civil Procedure, be and the same hereby are denied without prejudice to defendant, Time, Inc., to renew the same when discovery has been completed by all the parties.

## MEMORANDUM AND ORDER ON MOTIONS FOR SUMMARY JUDGMENT FILED NOV. 23, 1970.

This is an action for libel brought against Time, Inc., Arnold "Red" Auerbach and George Plimpton, to recover damages resulting from an article appearing in the December 23, 1968, issue of Sports Illustrated. The allegedly libelous statements were printed in connection with a cover story on Bill Russell, star center for the Boston Celtics professional basketball team. George Plimpton, the author of the article, chose a format which included interviews with various people in the sporting world who had come into contact with Russell. Among those he selected was "Red" Auerbach, coach of the Boston Celtics, to whom is attributed the following statement upon which the plaintiff bases this action:

"\* \* \* That's a word you can use about him [Russell]—he 'destroyed' players. You take Neil Johnston—a good set shot and a great sweeping hook shot, a big long-armed guy who played for Philly and was the leading scorer in the NBA the year before. Russell destroyed him. He destroyed him psychologically as well, so that he practically ran him out of

organized basketball. He blocked so many shots that Johnston began throwing his hook farther and farther from the basket. It was ludicrous, and the guys along the bench began to laugh, maybe in relief that they didn't have to worry about such a guy themselves."

The affidavit of "Red" Auerbach has been filed with the Court and states that the article in Sports Illustrated accurately sets forth his interview with George Plimpton.

The matter is presently before the Court for disposition of motions for summary judgment made by both the plaintiff and the defendant, Time, Inc., and also for disposition of Time, Inc.'s motion to dismiss. The defendant had previously moved for summary judgment and dismissal for failure to state a claim upon which relief could be granted, but the Court denied those motions without prejudice because the procedures of discovery had not been completed. On May 15, 1970, the defendant, Time, Inc., renewed its motions and oral argument was held on October 2, 1970. For the reasons hereinafter set out, both motions for summary judgment will be denied.

### I. *State Law*

Inherent within the motion under Rule 56 for summary judgment and the motion under Rule 12(b) (6) for dismissal for failure to state a claim upon which relief could be granted is a necessity for a discussion of the law of North Carolina as it applies to this situation. Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A. L.R. 1487 (1937).

In viewing the evidence in a light most favorable to the plaintiff, the Court finds that a jury would have a reasonable basis upon which to find that the article in question was libelous *per se.* Flake v. Greensboro News, 212 N.C. 780, 195 S.E. 55 (1938) sets forth a definition of this term:

"Libels may be divided into three classes: (1) Publications which are obviously defamatory and which are termed libels per se; (2) publications which are susceptible of two reasonable interpretations, one of which is defamatory and the other is not; and (3) publications which are not obviously defamatory, but which become so when considered in connection with innuendo, colloquium, and explanatory circumstances. This type of libel is termed libel *per quod.*

\* \* \* \* \* \*

"It may be stated as a general proposition that defamatory matter written or printed \* \* \* may be libelous and actionable per se \* \* \* if they tend to expose plaintiff to public hatred, contempt, ridicule, aversion, or disgrace and to induce an evil opinion of him in the minds of right thinking persons and to deprive him of their friendly intercourse and society.

"In order to be libelous per se, it is not essential that the words should involve an imputation of crime, or otherwise impute the violation of some law, or moral turpitude, or immoral conduct. \* \* \* But defamatory words to be libelous per se must be susceptible of but one meaning and of such nature that the court can presume as a matter of law that they tend to disgrace and degrade the party or hold him up to public hatred, contempt, or ridicule, or cause him to be shunned and avoided. The imputation must be one tending to affect a party in a society whose standard of opinion the court can recognize."

\* \* \* \* \* \*

"The decisions in this jurisdiction, as well as others, clearly establish that a publication is libelous per se, or actionable per se, if, when considered alone without innuendo: (1) It charges that a person has committed an infamous crime; (2) it charges a person with having an infectious disease; (3) it tends to subject one to ridicule, contempt or disgrace; or (4) it tends to impeach one in his trade or profession." (Cites omitted)" 195 S. E. at 59–60.

The article states that the plaintiff was at one time during his career as a professional player destroyed psychologically, practically ran out of organized basketball, and playing so ludicrously that the players on the bench were laughing. It seems that this would tend to subject him to ridicule, contempt and/or disgrace; and, since the plaintiff is presently an assistant basketball coach at Wake Forest University, this might also tend to impeach him in his trade or profession.

Article I, § 20 of the Constitution of the State of North Carolina states:

"The freedom of the press is one of the great bulwarks of liberty, and therefore ought never to be restrained, but every individual shall be held responsible for the abuse of the same."

The North Carolina Supreme Court in Yancey v. Gillespie, 242 N.C. 227, 87 S. E.2d 210 (1955) viewed this section in the light of the doctrine of "qualified privilege."

" 'Every one has a right to comment on matters of public interest and concern, provided he does so fairly and with an honest purpose. Such comments or criticisms are not libelous, however severe in their terms, unless they are written maliciously.' (Cite omitted) * * *

" ' * * * In cases of qualified privilege, the falsehood of the [statement] will not of itself be sufficient to establish malice, for there is a presumption that the publication was made bona fide.' (Cites omitted) Whether a publication is privileged is a question of law to be determined by the court." 87 S.E.2d at 212.

Succinctly stated, qualified privilege will apply to a statement made or article written in good faith, without actual malice (as defined by the law of North Carolina), touching upon a topic in which the speaker or publisher has "an interest, or in respect to which he has a duty, public, personal, or private, either legal, judicial, political, moral, or social." Ponder v. Cobb, 257 N.C. 281, 126 S.E.2d 67, 78 (1962).

R. H. Bouligny, Inc. v. United Steelworkers of America, 270 N.C. 160, 154 S.E.2d 344 (1967) discusses the purpose for establishing the doctrine of "privilege":

"The basis of privilege is the public interest in the free expression and communication of ideas. Where this interest is sufficient to outweigh the interest of the state in protecting the individual or corporate plaintiff from damage to his or its reputation, social or business relationships, the law does not allow recovery of damages, actual or punitive, occasioned by the defamatory speech or publication." 154 S.E. 2d at 354.

The North Carolina courts have not, as of yet, extended this doctrine of qualified privilege to the field of sports reporting, nor is there any indication that they will do so in the future. This is a matter of state policy, for the state courts to determine. Brendle v. General Tire and Rubber Company, 304 F.Supp. 1262 (M.D.N.C.1969), speaking to the same question, held:

"[This Court is] not at liberty to surmise or search for hidden meanings within the opinions of the state appellate courts. It is the duty of this Court to apply the substantive law of the state in which it is located. Erie Railroad Company v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487 (1937).

* * * * * *

"Judge Learned Hand, in his dissenting opinion in Spector Motor Service, Inc., v. Walsh, 2 Cir., 139 F. 2d 809 (1944), vacated 323 U.S. 101, 65 S.Ct. 152, 89 L.Ed. 101 (1944), admonished the court not to speculate as to what the law will be nor 'to embrace the exhilarating opportunity of anticipating a doctrine which may be in the womb of time, but whose birth is distant.' 139 F.2d 823." 304 F. Supp. at 1266–1267.

850

However, even if qualified privilege were held to be applicable to this case, the Court finds, for the purpose of deciding the motions presently before it, that a jury would have a reasonable basis upon which to find the malice necessary to surmount the protection that the doctrine of qualified privilege affords. The malice necessary under North Carolina law to overcome the shield of qualified privilege should not be confused with the "actual malice" standard which has been developed from the First Amendment, freedom of the press, decisions under the United States Constitution. This latter standard is dealt with infra. (See page 851) North Carolina equates actual malice with reckless *or careless* publication. Littlejohn v. Piedmont Publishing Company, 7 N.C.App. 1, 171 S.E.2d 227, 229 (1969); Roth v. Greensboro News Company, 217 N.C. 13, 6 S.E.2d 882, 887 (1940). There are items contained in the Sports Illustrated editorial reference file which a jury could conclude were overlooked carelessly or negligently by the research staff and editors of Sports Illustrated. There are newspaper clippings which indicate that Johnston did have some good nights against Russell. There are newspaper reports and reports from Sports Illustrated's own stringers which state that, rather than being practically run out of organized basketball, Johnston played for approximately two and one-half seasons after Russell entered the league and then Johnston became coach of the Philadelphia Warriors, the team for which he had played. There are also reports included within the file from which one might conclude that rather than being run off the active player list by Russell, he was taken off because of the injuries that he suffered during his last years as an active player. Furthermore, there are also indications in the editorial reference file that there was some animosity between Red Auerbach and Neil Johnston.

Under applicable state decisions, neither party is entitled to an award of summary judgment in its favor. There are presented in this case genuine issues of material facts. Of no little importance is that issue concerning whether the statement concerning the plaintiff is true or false. The plaintiff has alleged falsity and offered materials to support this allegation. The defendant, Time, Inc., has plead the affirmative defense of truth and has likewise offered materials to support this defense. This issue is a matter which cannot be determined upon a trial by affidavits and depositions. Furthermore, the plaintiff has stated a claim upon which relief can be granted in that he has alleged facts which give rise to a cause of action for libel *per se*. Therefore, the only question which remains to be determined is whether the defendant, Time, Inc., is entitled to summary judgment on the basis of federal constitutional principles.

## II. *Federal Question*

### A. *Public Officials and Public Figures*

The main thrust of defendant's argument is based upon New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686, 95 A.L.R.2d 1412 (1964), which gave rise to the "actual malice" test to be used in libel actions brought by public officials. Under this standard, a public official could not recover in an action for damages unless it was proved that the libelous statement was made with knowledge that the statement was false or with reckless disregard as to whether the statement was false or not. The rationale behind this decision was the overriding importance of the constitutional guaranty of freedom of speech and the press when it came into conflict with the right of a public official to pursue to successful completion a libel action based on defamatory statements concerning his official conduct. Curtis Publishing Company v. Butts, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967); reh. den. 389 U.S. 889, 88 S.Ct. 11, 13, 19 L.Ed.2d 197 (1967) decided by a divided court, held

that public figures would be held to the same burden as public officials in an action for libel. Mr. Justice Harlan, speaking for four members of the court, would have allowed recovery by a public figure without a showing of "actual malice" upon proof of "highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers." 388 U.S. at 155, 87 S.Ct. at 1991, 18 L.Ed.2d at 1111.

However, this Court finds that the plaintiff, Neil Johnston, is not a public figure, and therefore, under this test, determines that the constitutional safeguards established by New York Times Co. v. Sullivan and its progeny are not applicable to the case presently before it. The Supreme Court in Curtis Publishing Company v. Butts, *supra*, in describing Wallace Butts, athletic director of the University of Georgia, and Edwin Walker, a retired Army General actively engaged in politics, defined the term "public figure":

> "And both Butts and Walker commanded a substantial amount of independent public interest at the time of the publications; both, in our opinion, would have been labeled 'public figures' under ordinary tort rules. * * * Butts may have attained that status by position alone and Walker by his purposeful activity amounting to a thrusting of his personality into the 'vortex' of an important public controversy, but *both commanded sufficient continuing public interest and had sufficient access to the means of counterargument to be able 'to expose through discussion the falsehood and fallacies' of the defamatory statements. * * *"* 388 U.S. at 154–155, 87 S.Ct. at 1991, 18 L.Ed.2d at 1111. (Emphasis added)

At the time that this article was published, the plaintiff was an assistant basketball coach at a small southern university and definitely did not command a continuing public interest nor did he have access to the means of counterargument. Although, according to the above definition, the plaintiff was a public figure in the 1950's due to his athletic prowess as center for the Philadelphia Warriors professional basketball team, the passage of time has caused the plaintiff's name to pass from the public spotlight. In a statement entirely analogous to the situation here, the United States Supreme Court, while dealing with a libel action brought by a public official in Rosenblatt v. Baer, 383 U.S. 75, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966) stated: "To be sure, there may be cases where a person is so far removed from a former position of authority that comment on the manner in which he performed his responsibilities no longer has the interest necessary to justify the New York Times rule." 383 U.S. at 87, 86 S.Ct. at 677, 15 L.Ed.2d at 606, fn. 14. A public figure, as well as a public official, can be so far removed from his former position in the public eye, that the publisher will no longer enjoy the prophylactic treatment accorded him when he deals with those persons who truly are public officials or public figures. Such is the situation here.

### B. *Actual Malice*

This Court concludes that if the plaintiff were a "public figure" or if he were otherwise amenable to either standard as set out in Curtis Publishing Company v. Butts, *supra*, he could not, as a matter of law, recover in this action and summary judgment should be granted in favor of the defendant. There is nothing in the affidavits and depositions now before the Court which would give substance to a finding of actual malice, as defined in New York Times Co. v. Sullivan, or an extreme departure from the standards of conduct of responsible publishers, as enunciated by Mr. Justice Harlan in Curtis Publishing Company v. Butts.

The "actual malice" spoken of in this context is distinct and separate from the express or actual malice necessary under North Carolina decisions to overcome a

defense of qualified privilege. The former demands far more than proof of ordinary negligence. Curtis Publishing Company v. Butts, *supra*. Furthermore, the former standard of actual malice cannot be inferred merely from a false statement occasioned by spite, hostility or a deliberate intention to harm. Greenbelt Cooperative Publishing Ass'n Co. v. Bresler, 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970). However, North Carolina would support a finding of malice upon proof of carelessness. Littlejohn v. Piedmont Publishing Company, *supra*; Roth v. Greensboro News Company, *supra*.

St. Amant v. Thompson, 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968) contains a brief history of the United States Supreme Court decisions dealing with the "actual malice" test:

"Our cases, however, have furnished meaningful guidance for the further definition of a reckless publication. In New York Times, supra, the plaintiff did not satisfy his burden because the record failed to show that the publisher was aware of the likelihood that he was circulating false information. In Garrison v. State of Louisiana, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964), * * * the opinion emphasized the necessity for a showing that a false publication was made with a 'high degree of awareness of * * * probable falsity.' 379 U.S., at 74, 85 S.Ct., at 216 [13 L.Ed.2d, at 133]. Mr. Justice Harlan's opinion in Curtis Publishing Co. v. Butts * * * stated that evidence of either deliberate falsification or reckless publication 'despite the publisher's awareness of probable falsity' was essential to recovery by public officials in defamation actions. *These cases are clear that reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication.* Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice." 390 U.S. at 731, 88 S.Ct. at 1325, 20 L.Ed.2d at 267. (Emphasis added)

There is nothing presently before the Court which would indicate that there was *reckless* conduct upon the part of the defendant, Time, Inc., nor is there anything which would tend to show an *extreme* departure from the standards of responsible publishers.

### C. *Public Interest*

A doctrine which has arisen, mainly in the Federal Circuit Courts of Appeals and notably those of the Fifth Circuit, is that of "public interest." See Time, Inc. v. McLaney, 5 Cir., 406 F.2d 565; cert. den. 395 U.S. 922, 89 S.Ct. 1776, 23 L.Ed.2d 239 (1969); Bon Air Hotel, Inc. v. Time, Inc., 5 Cir., 426 F.2d 858 (1970); Time, Inc. v. Ragano, 5 Cir., 427 F.2d 219 (1970); Wasserman v. Time, Inc., D.C.Cir., 424 F.2d 920, 921 (1970); Rosenbloom v. Metromedia, Inc., 3 Cir., 415 F.2d 892 (1969); cert. granted 397 U.S. 904, 90 S.Ct. 917, 25 L.Ed.2d 85 (1970); United Medical Laboratories v. Columbia Broadcasting System, 9 Cir., 404 F.2d 706 (1968); cert. den. 394 U.S. 921, 89 S.Ct. 1197, 22 L.Ed.2d 454 (1969). According to this doctrine, when the subject matter with which a particular article deals is of such a nature that there is a substantial and vital and legitimate public concern about it, then the publisher of the article will be accorded the protection afforded by Curtis Publishing Company v. Butts. Thus when the person allegedly libeled is neither a public official nor a public figure, but the article concerns a matter of public interest, the plaintiff will have the burden of proving either actual malice as defined in New York Times Co. v. Sullivan or an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers as defined by Mr. Justice Harlan in Curtis Publishing

Company v. Butts.[1] The cases applying the public interest doctrine have been concerned with the topics of organized crime, [Time, Inc. v. Ragano, *supra;* Wasserman v. Time, Inc., *supra;* Blanke v. Time, Inc., 308 F.Supp. 378 (D.C. 1970)], public health, [United Medical Laboratories v. Columbia Broadcasting System, *supra*], and "hot news" items concerning the sale of allegedly obscene magazines [Rosenbloom v. Metromedia, Inc., *supra*.]

The Ninth Circuit in United Medical Laboratories v. CBS, *supra,* 404 F.2d at 712 stated:

> "The primary basis of general interest in the *Butts* situation would have to be regarded as the public's right to be concerned over the nature and significance of the things alleged to have been done, with the persons said to have done them being secondary elements therein."

■ Bon Air Hotel Inc. v. Time, Inc., 5 Cir., 426 F.2d 858 (1970), concerns a libel action brought by a corporation which owned a hotel which had been referred to in a Sports Illustrated article concerning the 1964 Masters' Golf Tournament. The District Court had granted defendant's motion for summary judgment on the basis that this reference to the hotel in the article was in the public interest and therefore the "actual malice" test would have to be applied. The plaintiff appealed and argued:

> " * * * (t)hat the Masters' Golf Tournament does not make an inconspicuous and little-known hotel a matter of such public interest."

The Court answered:

> "In rejecting this contention, the district court found that the national interest in the particular event and the

interest of 100,000 golf enthusiasts in the accommodations in Augusta during the Masters' Tournament constituted a valid public interest. We agree. Although some 'public interest' cases have dealt with matters of a more critical nature, e.g., public health and organized crime, we conclude that Time's article, focusing on Augusta, the Masters' Golf Tournament and the public accommodations available for the many thousands of spectators, was of a legitimate public interest. * * *" 426 F.2d at 862.

The Court finds that the fact situation before it is distinguishable from that presented in *Bon Air.* Over 100,000 golf fans, many of them traveling great distances had a legitimate concern about the arrangements for the tournament and the facilities available for lodging. Although the article was written in a humorous vein, it served to inform the reading public of the condition of public accommodations available in the Augusta area for both spectators and players. This was an example of a legitimate public interest. Such is not the case with the article presently before the Court which deals with the naming of Russell as sportsman of the year and his confrontation on the basketball court with the plaintiff about a decade prior to the date of the publication. That which is interesting to the public may not always be in the public interest.

Another case, which like *Bon Air* is distinguishable from the present fact situation before the Court, is Sellers v. Time, Inc., 299 F.Supp. 582 (E.D. Pa.1969). This was a suit by a "duffer" golfer against Time for an allegedly defamatory report in "The Law" section of that magazine. The article concerned a lawsuit which had been brought against Sellers by a golfing partner who

---

I. Apparently the D.C., Third and Fifth Circuits have completely rejected this latter test and would apply only the actual malice standard to those matters considered to be in the public interest. However, the Ninth Circuit has indicated that it might use either standard. [Cepeda v. Cowles Magazines and Broadcasting, Inc., 9 Cir., 392 F.2d 417 (1968)] and the United States Supreme Court has recently alluded to the same. [Greenbelt Cooperative Publishing Association v. Bresler, 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970).]

had been struck by the ball when he had been standing behind Sellers who was teeing off. The district court held, *inter alia*, that this report was a publication touching upon public issues or matters of public concern and thus should be accorded the constitutional privileges granted to it by New York Times v. Sullivan. This Court concurs with the holding of the district court insofar as it supports the proposition that the reporting of judicial decisions is in the public interest. However, with this limitation in mind, *Sellers* has no application to a denial of the public interest doctrine in the present case. In Sellers v. Time, Inc., 3 Cir., 423 F.2d 887 (1970), the Court of Appeals affirmed the district court solely on the basis of state law and did not reach the constitutional issues presented by the case. The United States Supreme Court has denied review in this case. 91 S.Ct. 61, 27 L.Ed.2d 61 (1970).

The United States Supreme Court in Time, Inc. v. Hill, 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967) held that the opening of a new play based on an incident which had occurred some three years prior to the article was a matter of public interest. The Supreme Court quoted Winters v. New York, 333 U.S. 507, 510, 68 S.Ct. 665, 92 L.Ed. 840, 847 (1948) for the proposition that "The line between the informing and the entertaining is too elusive for the protection of * * * [freedom of the press]." 385 U.S. at 388, 87 S.Ct. at 542, 17 L.Ed.2d at 467. However, the court, by its own language limited its holding to the invasion of privacy situation which was then before it.

"This is neither a libel action by a private individual nor a statutory action by a public official. * * * Were this a libel action, the distinction which has been suggested between the relative opportunities of the public official and the private individual to rebut defamatory charges might be germane. And the additional state interest in the protection of the individual against damage to his reputation would

be involved. * * * Moreover, a different test might be required in a statutory action by a public official, as opposed to a libel action by a public official or a statutory action by a private individual. Different considerations might arise concerning the degree of 'waiver' of the protection the State might afford. * * * *" 385 U.S. at 390–391, 87 S.Ct. at 543–544, 17 L.Ed.2d at 468–469.

Furthermore, the Supreme Court added the following caveat:

"Our decision today is not to be taken to decide any constitutional questions which may be raised in 'libel per quod' actions involving publication of matters of public interest, *or in libel actions where the plaintiff is not a public official*." 385 U.S. at 384, 87 S. Ct. at 541, 17 L.Ed.2d at 465, fn. 7. (Emphasis added.)

Thus by its own language, Time, Inc. v. Hill has preempted itself from the situation presently before the Court, a libel action by a plaintiff who is neither a public official nor a public figure.

▆▆▆ Thus, upon the basis of the foregoing reasons, the Court concludes that the defendant, Time, Inc., has failed to set forth a sufficient constitutional basis upon which to grant summary judgment.

## ORDER

For the reasons stated above, it is ordered:

1. That the plaintiff's motion for summary judgment be, and the same hereby is, denied;

2. That except as set forth in No. 3 below, the motion by defendant, Time, Inc., for summary judgment be, and the same hereby is, denied;

3. That the motion by the defendant, Time, Inc., for summary judgment be, and the same hereby is, granted on the issue of whether or not actual malice as defined in New York Times Co. v. Sullivan is present in this action. It is also granted on the issue of the presence in

this action of an extreme departure from the standards of conduct of responsible publishers as defined in Curtis Publishing Company v. Butts.

4. That the motion by defendant, Time, Inc., for dismissal under Rule 12(b) (6), Federal Rules of Civil Procedure, be, and the same hereby is, denied.

Furthermore, it is adjudged that a prompt appeal of this Memorandum Opinion and Order under Title 28, U.S. C. § 1292(b) may materially advance the ultimate determination of the litigation, and the Court is of the opinion that herein contained are controlling questions of law as to which there are substantial grounds for difference of opinion.