**TIME, INC., a New York Corporation, Appellant-Cross-Appellee,**

v.

**Neil JOHNSTON, Appellee-Cross-Appellant.**

**Nos. 71–1070, 71–1071.**

United States Court of Appeals, Fourth Circuit.

Argued May 5, 1971.

Decided Sept. 13, 1971.

---

Harold R. Medina, Jr., New York City (Egbert L. Haywood, Durham, N. C., W. Dennis Cross, Cravath, Swaine & Moore, New York City, and Haywood, Denny & Miller, Durham, N. C., on the brief) for TIME, Inc.

Roy G. Hall, Jr., and Weston P. Hatfield, Winston-Salem, N. C. (Hatfield, Allman & Hall, Winston-Salem, N. C., on the brief), for Neil Johnston.

Before WINTER, BUTZNER and RUSSELL, Circuit Judges.

DONALD RUSSELL, Circuit Judge:

The defendant is the publisher of SPORTS ILLUSTRATED, a weekly periodical devoted to sports and athletics. Annually, it features its selection of "Sportsman of the Year". In 1968, it chose Bill Russell, a star on the professional basketball team of the Boston CELTICS, as its "Sportsman of the Year" and engaged George Plimpton, a well-known writer, especially in the field of sports, to write the feature article. In developing his article, Plimpton chose to quote from interviews he had had with persons acquainted with Russell and his exceptional talents as a basketball player. In quoting an interview with Arnold Auerbach, the coach of Russell with the CELTICS, Plimpton included in his article the following paragraph:

"* * * That's a word you can use about him—he (Russell) 'destroyed' players. You take Neil Johnston— * * *, Russell destroyed him. He destroyed him psychologically as well, so that he practically ran him out of organized basketball. He blocked so many shots that Johnston began throwing his hook farther and farther from the basket. It was ludicrous, and the guys along the bench began to laugh, maybe in relief that they didn't have to worry about such a guy themselves."

The "Johnston" referred to in the quoted paragraph is the plaintiff. At the time of the incident referred to, he was an outstanding professional basketball player with the Philadelphia WARRIORS basketball team. He subsequently retired from professional basketball and is now the assistant basketball coach at Wake Forest University in Winston-Salem, North Carolina. Following the publication of the article, he sued the defendant, contending that he had been libeled in the quoted paragraph and had been "damaged (him) in his chosen profession, that of coaching basketball."

After discovery was completed, both parties moved for summary judgment.[1] The District Court, after argument, denied both motions, 321 F.Supp. 837, and both parties have appealed.

Upon application under Section 1292 (b), 28 U.S.C., this Court granted leave to the parties to take an interlocutory cross-appeal.

We reverse the denial of defendant's motion for summary judgment and dismiss plaintiff's cross-appeal.

The defendant invoked, in support of its motion, the constitutional rule of privilege, granted under the First Amendment, as applied in New York Times Co. v. Sullivan (1964) 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686, and related cases,[2] to publications relating to

---

1. Prior to discovery, defendant had moved for summary judgment. Such motion was found to be premature, prior to completion of discovery. After discovery had been completed, the motion involved in this appeal was filed.

2. New York Times Co. v. Sullivan, *supra*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d

686; Garrison v. Louisiana (1964) 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125; Linn v. United Plant Guard Workers (1966) 383 U.S. 53, 86 S.Ct. 657, 15 L.Ed.2d 582; Rosenblatt v. Baer (1966) 383 U.S. 75, 86 S.Ct. 669, 15 L.Ed.2d 597; Time, Inc. v. Hill (1967) 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456; Curtis Publishing Co. v. Butts and Associated

the public conduct of public officials or public figures or for publications dealing with either public or private persons involved in matters of legitimate public interest. Specifically, it contends both that the publication in question related to the public conduct of the plaintiff in his character of a public figure and that it fell within the classification of "a matter of legitimate public interest" as enunciated in the recent case of Rosenbloom v. Metromedia, Inc. (1971) 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296, decided June 7, 1971. On either ground, it urges it was entitled to the conditional immunity afforded under *New York Times*.

■ There can be no dispute that at the time of the events discussed in the challenged publication the plaintiff met the criteria of "a public figure". "Public figures", within the contemplation of the rule in *New York Times*, as enlarged by subsequent cases, are "those persons who, though not public officials, are 'involved in issues in which the public has a justified and important interest' " and "include artists, athletes, business people, dilettantes, anyone who is famous or infamous because of who he is or what he has done." Cepeda v. Cowles Magazines and Broadcasting, Inc. (9th Cir. 1968) 392 F.2d 417, 419, cert. denied 393 U.S. 840, 89 S.Ct. 117, 21 L.Ed.2d 110. Consonant with this definition, a college athletic director,[3] a basketball coach,[4] a professional boxer[5] and a professional baseball player,[6] among others, have all been held to be "public figures". The plaintiff, as he figures in the challenged publication, fits this definition of a "pub-

lic figure". ⌊Certainly, he was as much a "public figure" as the plaintiff in *Cepeda* or as the plaintiffs in *Grayson* and *Cohen*. He had offered his services to the public as a paid performer and had thereby invited comments on his performance as such. In a sense, he assumed the risk of publicity, good or bad, as the case might be, so far as it concerned his public performance. The publication in question related strictly to his public character. It made no reference to his private life, it involved no intrusion into his private affairs. It dealt entirely with his performance as a professional basketball player; it discussed him in connection with a public event in which the plaintiff as a compensated public figure had taken part voluntarily.⌋

The plaintiff does not seriously question the defendant's premise that he was a "public figure" at the time of the event discussed in the publication; and the District Court apparently assumed in its decision that the plaintiff was such a "public figure". The plaintiff points out, though, that the event, to which the publication related, occurred twelve years before the publication and nine years after the plaintiff had retired as a professional basketball player. It is plaintiff's position that he had, at the time of publication, shed his character of "public figure" and that the *New York Times* standard was, therefore, inapplicable. This is the basic point of difference between the parties on this aspect of the case. The District Court accepted the plaintiff's view. In so doing, it erred.

Press v. Walker (1967) 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094, reh. den. 389 U.S. 889, 88 S.Ct. 11, 19 L.Ed.2d 197; Beckley Newspapers Corp. v. Hanks (1967) 389 U.S. 81, 88 S.Ct. 197, 19 L.Ed.2d 248; St. Amant v. Thompson (1968) 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262; Time, Inc. v. Pape (1971) 401 U.S. 279, 91 S.Ct. 633, 28 L.Ed.2d 45; Monitor Patriot Co. v. Roy (1971) 401 U.S. 265, 91 S.Ct. 621, 28 L.Ed.2d 35; Ocala Star-Banner Company v. Damron (1971) 401 U.S. 295, 91 S.Ct. 628, 28 L.Ed.2d 57; and Rosenbloom v. Metro-

media Inc. (1971) 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296.

3. Curtis Publishing Co. v. Butts, *supra*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094.

4. Grayson v. Curtis Publishing Company (1967) 72 Wash.2d 999, 436 P.2d 756; see comment, 44 Wash.L.Rev. 461 (1969).

5. Cohen v. Marx (1949) 94 Cal.App.2d 704, 211 P.2d 320.

6. Cepeda v. Cowles Magazines and Broadcasting, Inc., *supra*, 392 F.2d 417.

The District Court relies for its conclusion primarily on a comment set forth in a note in Rosenblatt v. Baer (1966) 383 U.S. 75, 87, 86 S.Ct. 669, 677, 15 L. Ed.2d 597, note 14: "To be sure, there may be cases where a person is so far removed from a former position of authority that comment on the manner in which he performed his responsibilities no longer has the interest necessary to justify the *New York Times* rule." This, however, is not such a case as was envisaged by Justice Brennan. The claim that plaintiff had retired as a player in 1958, nine years before the publication, is misleading. While plaintiff did retire as a player in 1958, he, by his own affidavit, "remained in organized professional basketball, until 1966." He thus identifies himself with professional basketball up to approximately two years of the publication in question. And, at the time of the publication itself, he was a college basketball coach, still involved as a public figure in basketball. Perhaps as a college basketball coach, he was not as prominently identified with the sport as in his playing days. Neither was *Butts* as intimately identified with football as an athletic director as he had been as a coach but that did not make him an anachronism in football history any more than the plaintiff, with his outstanding record, had become a forgotten figure among the many devotees of the game of basketball.

That even the plaintiff did not reckon his career as a professional basketball player forgotten is demonstrated by his claim in this case that a reflection on that career and on his eminence as a player damages him in his present occupation as a college basketball coach. By his claim for damages here, he is contending that his standing as a college basketball coach rests substantially on the public recollection and estimation of his former career as a professional bas-

ketball player; and it is for that reason he sues. It is because he is still engaged in basketball and because of the effect that any adverse comment on his record and achievements as a basketball star may have on his present position in basketball that he claims damage herein. It is manifestly inconsistent for him to contend that, when his basis for damage is thus grounded, his "public figure" career has become so obscure and remote that it is no longer a subject of legitimate public interest or comment.

The event to which the publication related remained a matter of public interest not simply because of its relation to plaintiff's own public career; it had an equal or greater interest as marking the spectacular debut of Russell in a career that was still phenomenal at the time of the publication. It was an event that had, in the language of one sports writer reporting it, a "tremendous" "psychological effect on the league". It was an event that was vivid in the memory of Auerbach at the time of the publication and likely in that of other followers of the sport. It is fair to assume that in the memory of basketball fans, the event described was neither remote nor forgotten; nor was it devoid of newsworthiness.

Moreover, mere passage of time will not necessarily insulate from the application of New York Times Co. v. Sullivan, publications relating to the past public conduct of a then "public figure". No rule of repose exists to inhibit speech relating to the public career of a public figure so long as newsworthiness and public interest attach to events in such public career. This issue of remoteness as providing a basis for casting a veil about "public figures" in "public events" has often arisen in privacy cases. There are, it is true, distinctions between actions for an invasion of privacy and suits for defamation [7] but the same considera-

7. For the distinction between suits for privacy, in which the challenged statement is normally true, and actions for defamation, based on the falsity of the statement, see Thermo v. New England Newspaper Pub. Co. (1940) 306 Mass. 54, 27 N.E.2d 753, 755; Prosser, Law of Torts, pp. 834-9 (3d ed. 1964); Cf., Time, Inc. v. Hill, *supra*, 385 U.S. at pp. 384-385, note 9, 87 S.Ct. 534, 17 L.Ed.2d 456.

tions it would seem would be present in either case in determining whether mere passage of time will remove the protection afforded by the constitutional privilege created by *New York Times* for a publication relating to a past event in the career of a "public figure". The vast majority of the reported authorities lend no support to the view urged by the plaintiff and adopted by the District Court. Cohen v. Marx, *supra*, 211 P.2d at p. 321, where the plaintiff had terminated his career as a professional boxer ten years prior to the offending publication, states convincingly the reasons for denial of remoteness:

"\* \* \* it is evident that when plaintiff sought publicity and the adulation of the public, he relinquished his right to privacy on matters pertaining to his professional activity, and he could not at his will and whim draw himself like a snail into his shell and hold others liable for commenting upon the acts which had taken place when he had voluntarily exposed himself to the public eye. As to such acts he had waived his right of privacy and he could not at some subsequent period rescind his waiver."

To the same effect, among others, are Sidis v. F–R. Pub. Corporation (2d Cir. 1940) 113 F.2d 806, 809, cert. den. 311 U.S. 711, 61 S.Ct. 393, 85 L.Ed. 462; Estill v. Hearst Publishing Co. (7th Cir. 1951) 186 F.2d 1017, 1022; Werner v. Hearst Publishing Company (9th Cir. 1961) 297 F.2d 145, 147; Smith v. Doss (1948) 251 Ala. 250, 37 So.2d 118, 121; Barbieri v. News-Journal Company (Del. 1963) 189 A.2d 773, 775–776.

■ The District Court was, also, in error in concluding that the defendant was not entitled to claim the protection of *New York Times* on the ground that the offending publication commented on the plaintiff in relation to a matter of legitimate public interest. In its decision, the District Court in this case anticipated the subsequent decision of the Supreme Court in Rosenbloom v. Metromedia, Inc., *supra*, which, discarding "the artificiality, \* \* \* of a simple distinction between 'public' and 'private' individuals or institutions",[8] held that First Amendment protection extends "to all discussion and communication involving matters of public or general concern, without regard to whether the persons involved are famous or anonymous", (91 S.Ct., p. 1820) and that a publication, though false, which concerned "a subject of legitimate public interest, even though the target is a 'private' citizen" (Justice White's opinion, 91 S.Ct. p. 1827) is within the orbit of the *New York Times* privilege. The District Court, while recognizing this extension of the scope of *New York Times*, held, however, that the subject matter of this publication was not of such legitimate public interest or concern as to qualify for protection thereunder. We disagree.

*Rosenbloom*, it is true, did not attempt to delineate the exact limits of the phrase, "matter of public or general interest", as used in the plurality opinion, choosing to leave that task, as it put it, "to future cases". It did declare that the term was not "to be limited to matters bearing broadly on issues of responsible government". It cited Time, Inc. v. Hill (1967) 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456, by way of illustration, to the effect that the "opening of a new play linked to an actual incident, is a matter of public interest". In so doing, the plurality opinion was substantially restating what the Court had emphasized in *Hill* that the sweep of the *New York Times* privilege is not confined to

8. Mr. Justice Brennan, in his plurality opinion, expressed the reason for discarding this distinction thus:

"If a matter is a subject of public or general interest, it cannot suddenly become less so merely because a private individual is involved, or because in some sense the individual did not 'voluntarily' choose to become involved. The public's primary interest is in the event; the public focus is on the conduct of the participant and the content, effect, and significance of the conduct, not the participant's prior anonymity or notoriety." (91 S.Ct., p. 1819).

"political expression or comment upon public affairs," nor even matters of social utility or educational value.[9] It embraces the entire range of legitimate public interest. Davis v. National Broadcasting Company (D.C.La.1970) 320 F.Supp. 1070.[10] Such a test clearly is sufficient to cover sports and sports figures, whose "public interest" character is amply demonstrated by the elaborate sports section in every daily newspaper published in this nation and by the numerous periodicals, such as that involved here, exclusively devoted to sports. This "public interest" in sports was the basis for providing First Amendment privilege for the publication involved in Bon Air Hotel, Inc. v. Time, Inc. (5th Cir. 1970) 426 F.2d 858,[11] and is at the heart of the Court's identification of the plaintiffs as "public figure(s)" in Butts, Grayson and Cohen. It was applied in Garfinkel v. Twenty-First Century Publishing Co. (1968) 30 A.D.2d 787, 291 N.Y.S.2d 735, where basketball and basketball scouting were stated to be matters of "public interest" in the light of the great attraction the sport has for the public. And, in Sellers v. Time, Inc. (D.C.Pa.1969) 299 F.Supp. 582, 585, aff. 423 F.2d 887, cert. den. 400 U.S. 830, 91 S.Ct. 61, 27 L.Ed.2d 61, an article dealing with the unusual flight of a golf ball in a golf game, taken in connection with the popularity of golf,

was deemed a matter of such public interest as to qualify under *New York Times.*

In summary, we conclude that both because of plaintiff's classification of a "public figure" and because the publication was "speech affecting individuals that is of public interest",[12] the defendant was clearly entitled to invoke the constitutional privilege afforded by the rule in New York Times Co. v. Sullivan and related cases.

■ The plaintiff, by his cross-appeal, however, has raised the point that, even if defendant be entitled to a First Amendment privilege, the motion for summary judgment should have been denied because there was sufficient evidence in the record that the defendant had published the challenged item with actual knowledge of its falsity, or recklessly without regard to whether it was true or not and thereby lost its constitutional privilege. The District Court concluded to the contrary. Recognizing that, if the *New York Times* immunity rule applies, "summary judgment, rather than trial on the merits, is a proper vehicle for affording constitutional protection," where there is no substantive basis for a finding of "knowing falsity or reckless disregard",[13] it held "that if the plaintiff were a 'public figure' or if

9. Farnsworth v. Tribune Company (1969) 43 Ill.2d 286, 253 N.E.2d 408, 411, in explaining the finding of "public interest" in *Hill*, and in discussing the boundaries of the term, as applied in this context, said:

"There is no indication that public discussion of this subject (i. e., the subject-matter of the play) would enhance the resolution of any serious social or governmental problems, or advance the arts. Rather, the key seemed to be that it was a matter of public interest and that fact was sufficient to trigger at least the constitutional protections of *Butts.*"

10. Cf., Winters v. New York (1948) 333 U.S. 507, 510, 68 S.Ct. 665, 667, 92 L.Ed. 840:

"The line between * * * informing and * * * entertaining is too elusive * * *. Everyone is familiar with instances of propaganda through fiction. What is one man's amusement, teaches another's doctrine * * *."

11. Cited with approval in the plurality opinion in *Rosenbloom.* See note 14 (91 S.Ct. p. 1821).

12. See, Kalven, The Reasonable Man and the First Amendment, 1967 Sup.Ct.Rev. 267.

13. Bon Air Hotel, Inc. v. Time, Inc., *supra,* 426 F.2d pp. 864–865; Washington Post Company v. Keogh (1966) 125 U.S.App. D.C. 32, 365 F.2d 965, 967–968, cert. den. 385 U.S. 1011, 87 S.Ct. 708, 17 L.Ed. 2d 548.

he were otherwise amenable. to either standard as set out in Curtis Publishing Company v. Butts, *supra,* he could not, as a matter of law, recover in this action and summary judgment should be granted in favor of the defendant. There is nothing in the affidavits and depositions now before the Court which would give substance to a finding of actual malice, as defined in New York Times v. Sullivan, or an extreme departure from the standards of conduct of responsible publishers, as enunciated by Mr. Justice Harlan in Curtis Publishing Company v. Butts." [14] We agree that there is no basis in the record to support a finding of "knowing falsehood or reckless disregard" on the part of the defendant.

■ It is undisputed that Auerbach, whose statement is quoted in the allegedly offensive statement, was correctly quoted. So long as the press correctly quotes another's statement about a matter of legitimate public interest, does not truncate or distort it in any way, and properly identifies the source, recent decisions indicate that it may properly claim the protection of *New York Times.* See Time, Inc. v. Pape, *supra,* 401 U.S. at pp. 285–286, 91 S.Ct. 633, 28 L.Ed.2d 45; Greenbelt Co-op Pub. Ass'n v. Bresler (1970) 398 U.S. 6, at pp. 12–13, 90 S.Ct. 1537, 26 L.Ed. 2d 6; Medina v. Time, Inc. (1st Cir. 1971) 439 F.2d 1129, 1130. It is the plaintiff's contention, however, that the statement of Auerbach, though admittedly made by Auerbach and correctly quoted in the article, was known by the defendant to be false and defamatory and that, because of knowing falsity, the defendant is in no position to claim im-

munity under the doctrine of *New York Times.* To support such contention he points to two phrases as being knowingly false and defamatory. These phrases are "destroyed" and "psychologically destroyed", which he argues, taken in the context of the article and giving them their normal connotation, were libellous and were refuted by material in the defendant's own files. Manifestly, the challenged words were not used literally. No one reading the article would have assumed that Auerbach was stating that the plaintiff was actually and literally "destroyed", during the game being discussed. Auerbach was attempting to identify Russell's emergence as a star basketball player; he did that by recounting an event which, as he saw it, marked the beginning of Russell, the star, and incidentally, the eclipse of the plaintiff as star. In describing the event, he used phrases of some vividness, used them in a figurative, not literal, sense, used a form of hyperbole typical in sports parlance. *New York Times,* in its application, does not interdict legitimate or normal hyperbole. Sellers v. Time, Inc., *supra,* 299 F.Supp. at p. 585. To deny to the press the right to use hyperbole, under the threat of removing the protecting mantle of *New York Times,* would condemn the press to an arid, desiccated recital of bare facts. Just as it was plain in Greenbelt Co-op Pub. Ass'n v. Bresler, *supra,* 398 U.S. at p. 14, 90 S.Ct. at p. 1542, 26 L.Ed. 2d 6, that the term "blackmail" was mere hyperbole and did not charge "the commission of a criminal offense" and similarly that the word "bastard" in Curtis Publishing Company v. Birdsong (5th Cir. 1966) 360 F.2d 344, 348, was not intended to charge the highway patrol-

14. Because the term "actual malice", as used in the *New York Times* rule, has a very special definition, quite different from the common definition of the term, being restricted as it is to "knowing or reckless falsity", the omission of such term, in the application of the rule, seems to be suggested by Mr. Justice Brennan in *Rosenbloom,* note 18.

men with "having been born out of wedlock", so the phrases here were hyperbolic and meant, taken in their proper context, merely that Russell had completely outplayed and over-shadowed the plaintiff, not that Russell had literally "destroyed" him. And the records available in the files of the defendant, so far from refuting this opinion that Russell had on the occasion in question "dominated" and outplayed the plaintiff, gave support to that conclusion and provided a rational basis for Auerbach's perhaps vivid characterization. Cf., Time, Inc. v. Pape, *supra*, 401 U.S. at p. 290, 91 S.Ct. 633, 28 L.Ed.2d 45. Thus, in an interview with Russell reported earlier in SPORTS ILLUSTRATED Russell himself claimed that he had "psyched" Johnston in this their first encounter. And the comment of both Russell and Auerbach on the rivalry between Russell and the plaintiff on this occasion found confirmation in the account written contemporaneously by the sports reporter of *The New York Times*, an account which was in the files of the defendant. The article put it that, "Basketball fans all over the country buzzed about it (i. e., Russell's 'defensive wizardry') for days afterward." The adjective "psychological" was used both in this article and in other newspaper accounts in describing the impact of Russell's defensive methods on this occasion. There was thus no basis for any conclusion that the defendant was in possession of any fact that would have justified on its part a "high degree of awareness of * * * probable falsity" of the statement made by Auerbach. Cf., St. Amant v. Thompson, *supra*, 390 U.S. at p. 731, 88 S.Ct. at p. 1325, 20 L.Ed.2d 262. The District Court was accordingly clearly right in concluding that the record included "nothing * * * which would give substance" to a finding of "knowing falsity or reckless disregard" on the part of the defendant.

Affirmed in part, vacated in part, and remanded with directions that judgment be entered for the defendant.