**Harry Warren THUMA**

v.

**The HEARST CORPORATION, a body corporate of the State of Delaware.**

**Civ. No. 70–1048.**

United States District Court,
D. Maryland.

March 29, 1972.

tending that The Hearst Corporation (Hearst) violated the standards of New York Times v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).[1] Hearst has moved for summary judgment. The essential facts are undisputed, at least in their current summary judgment context.

Hearst, publisher of a daily newspaper widely disseminated in the metropolitan Baltimore area, including the section of that area in which Thuma resides and is stationed, published on October 14, 1969 and again on October 29, 1969 articles written by one of its reporters, Richard Irwin. Those articles include statements by family, friends and neighbors of Thomas Talbott, a 16-year old boy, who was shot by Thuma after members of the police force, including Thuma, were called to the Talbott home following misbehavior by the boy. *Inter alia*, each of those articles quotes a reference by the boy's father to the shooting as "cold-blooded murder."

■ In New York Times v. Sullivan, *supra*, the Supreme Court reversed a judgment in a libel action instituted by an elected commissioner of the City of Montgomery, whose duties included supervision of that city's police department. That action was based upon the publication by the Times of a full-page advertisement, purchased by the "Committee to Defend Martin Luther King and the Struggle for Freedom in the South," in which unfavorable references, some inaccurate, were made concerning the Montgomery police. The basic thrust of *New York Times* and its progeny is that the First Amendment's protection of freedom of speech, as applied to the states by the Fourteenth Amendment, prohibits the states, through common law libel actions instituted by plaintiffs seeking damages, from imposing penalties upon the dissemination of statements pertaining to matters of public concern. In *New York Times* itself,

---

William W. Cahill, Jr., and Weinberg & Green, Baltimore, Md., for plaintiff.

James J. Doyle, Jr., John B. Jaske and Sherbow, Shea & Doyle, Baltimore, Md., for defendant.

FRANK A. KAUFMAN, District Judge.

In this libel action, Thuma, a captain in the Baltimore County police force and commander of the Parkville police district in that county, seeks damages, con-

---

1. Thuma is a citizen of Maryland. Hearst is a Delaware corporation with its principal place of business in New York. The amount in controversy exceeds $10,000, exclusive of interest and costs. Accordingly, diversity jurisdiction exists.

Mr. Justice Brennan wrote (at 279–280, 84 S.Ct. at 726):

> The constitutional guarantees require, we think, a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with "actual malice" —that is, with knowledge that it was false or with reckless disregard of whether it was false or not.

In Time, Inc. v. Pape, 401 U.S. 279, 284, 91 S.Ct. 633, 28 L.Ed.2d 45 (1969), a Chicago deputy chief of police was deemed to be a "public official." Thus, it seems clear that Thuma, a police captain, is a "public official" as those two words are used in *New York Times*.[2] In St. Amant v. Thompson, 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968), a public official was held by the Supreme Court not to have sustained the burden of proving that false statements about him were made with "actual malice" as defined in *New York Times*. In *St. Amant*, Mr. Justice White wrote (at 730–732, 88 S.Ct. at 1325):

> "Reckless disregard," it is true, cannot be fully encompassed in one infallible definition. Inevitably its outer limits will be marked out through case-by-case adjudication, as is true with so many legal standards for judging concrete cases, whether the standard is provided by the Constitution, statutes, or case law. Our cases, however, have furnished meaningful guidance for the further definition of a reckless publication. In New York Times, supra, the plaintiff did not satisfy his burden because the record failed to show that the publisher was aware of the likelihood that he was circulating false information. In Garrison v. [State of] Louisiana, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964), also decided before the decision of the Louisiana Supreme Court in this case, the opinion emphasized the necessity for a showing that a false publication was made with a "high degree of awareness of . . . probable falsity." 379 U.S. at 74, 85 S.Ct., at 216 [13 L.Ed.2d at 133]. Mr. Justice Harlan's opinion in Curtis Publishing Co. v. Butts, 388 U.S. 130, 153, 87 S.Ct. 1975, 1991, 18 L.Ed.2d 1094 [1110] (1967), stated that evidence of either deliberate falsification or reckless publication "despite the publisher's awareness of probable falsity" was essential to recovery by public officials in defamation actions. These cases are clear that reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be

---

2. In Rosenbloom v. Metromedia, Inc., 403 U.S. 29, at 58–59, 91 S.Ct. 1811, at 1827, 29 L.Ed.2d 296 (1971), Mr. Justice White, in a separate concurring opinion, wrote:

> Mr. Justice Black, consistently with the views that he and Mr. Justice Douglas have long held, finds no room in the First Amendment for any defamation recovery whatsoever.

> Given this spectrum of proposed restrictions on state defamation laws and assuming that Mr. Justice Black and Mr. Justice Douglas will continue in future cases to support the severest of the restrictions, it would seem that at least five members of the Court would support each of the following rules:

> For public officers and public figures to recover for damage to their reputations for libelous falsehoods, they must prove either knowing or reckless disregard of the truth. All other plaintiffs must prove at least negligent falsehood, but if the publication about them was in an area of legitimate public interest, then they too must prove deliberate or reckless error. In all actions for libel or slander, actual damages must be proved, and awards of punitive damages will be strictly limited.

*See also* Curtis Publishing Co. v. Butts, 388 U.S. 130, 134, 154–155, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967). In the within case, in any event, there is no factual or legal doubt that plaintiff, Thuma, is a "public official."

sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice.

\* \* \* \* \* \*

The defendant in a defamation action brought by a public official cannot, however, automatically insure a favorable verdict by testifying that he published with a belief that the statements were true. The finder of fact must determine whether the publication was indeed made in good faith. Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call. Nor will they be likely to prevail when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation. Likewise, recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports. [Footnote omitted.]

A similar holding and a similar application of *New York Times* are set forth in Time, Inc. v. Pape, *supra*.

█ It appears undisputed that Irwin, and therefore Hearst, accurately and truthfully reported what had been said by the family, friends and neighbors of the Talbott boy when they were interviewed by Irwin. Thus, the facts in the within case are similar to those in Greenbelt Cooperative Publishing Ass'n v. Bresler, 398 U.S. 6, 12–13, 90 S.Ct. 1537, 1541, 26 L.Ed.2d 6 (1970), in which the Supreme Court unanimously reversed a judgment in favor of the plaintiff and remanded the case for further proceedings. Mr. Justice Stewart, in the majority opinion, wrote:

It is not disputed that the articles published in the petitioners' newspaper were accurate and truthful reports of what had been said at the public hearings before the city council. In this sense, therefore, it cannot even be claimed that the petitioners were guilty of any "departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers," Curtis Publishing Co. v. Butts, supra [388 U.S.] at 155 [87 S.Ct. 1975, at 1991, 18 L.Ed.2d at 1111] (opinion of Harlan, J.), much less the knowing use of falsehood or a reckless disregard of whether the statements made were true or false. New York Times Co. v. Sullivan, supra [376 U.S.] at 280 [84 S.Ct. 710, at 726, 11 L.Ed.2d 706]. [Footnote omitted.]

In *Greenbelt*, the Supreme Court held that the reporting by a small weekly newspaper of statements made by persons during public meetings of the Greenbelt City Council that a prominent real estate developer and builder in Greenbelt and a member of the Maryland House of Delegates from a neighboring district, who was then negotiating with the council in connection with land owned by him and sought by the council, was guilty of "blackmail," did not charge commission of the felony of blackmail. The Court wrote (at 14, 90 S.Ct. at 1542):

It is simply impossible to believe that a reader who reached the word "blackmail" in either article would not have understood exactly what was meant: it was *Bresler's public and wholly legal* negotiating proposals that were being criticized. \* \* \* On the contrary, even the most careless reader must have perceived that the word was no more than rhetorical hyperbole, a vigorous epithet used by those who considered Bresler's negotiating position extremely unreasonable. Indeed, the record is completely devoid of evidence that anyone in the city of Greenbelt or anywhere else thought Bresler had been charged with a crime. [Emphasis supplied.]

In essence, in the case at bar, Thuma complains generally about the reporting

by Irwin of the opinions of certain members and friends of the Talbott family that the shooting was unnecessary and zeroes in particularly upon two sentences in the two articles, both of which sentences state that Talbott's father had labelled the shooting of his son as "cold-blooded murder."

Defendant, in support of its motion for summary judgment, has filed affidavits of Irwin and of Edward Ballard, who was in October, 1960 city editor of the News American, that is, the newspaper involved herein. Both affiants have stated that neither of them (and in Ballard's case, his staff) had any reason to know that any portion of the articles contained any false statement. In resisting summary judgment herein, plaintiff does not challenge the credibility of either Irwin or Ballard. Rather, plaintiff relies upon testimony given by Irwin during a deposition proceeding, in which Irwin, who had been a uniformed Baltimore City police officer before he became a reporter, testified[3] that at the time of publication, "[w]hether [the shooting] was cold-blooded murder or not, I didn't know, and I sincerely doubted it,"[4] and that "I had no reason to believe it was cold-blooded murder,"[5] and "absent a quote" Irwin "would . . . [not] have . . . labelled the matter cold-blooded murder . . . ."[6] However, it is also evident from Irwin's deposition testimony that Irwin himself equated a "cold-blooded murder" with premeditated, or first-degree, murder.[7] Therefore, Irwin's testimony indicates only that at the time of publication he entertained a serious doubt that Thuma had committed first-degree murder. In other words, Irwin's testimony, which is the only ground upon which the plaintiff bases his contention that defendant acted with reckless disregard of the truth or falsity of its publication, does not indicate that Irwin at the time of publication seriously doubted the accuracy of the opinions of the family, friends and neighbors of the Talbotts that the shooting was unjustified even though he (Irwin) believed the shooting fell some degree short of being first-degree or premeditated murder.

It would seem most improbable that persons seeing the words "cold-blooded murder," as they were used in the context of the events reported in the articles, would interpret them as meaning premeditated murder. Whatever those words may connote in other circumstances, in this situation they were rather clearly hyperbole expressing the father's most vehement feeling that the shooting was completely unnecessary. As Irwin himself stated in his deposition, the statement of Talbott's father that the shooting was "cold-blooded murder" "just summed up this feeling of the entire family."[8] At no place in either of the two articles is it suggested that anyone considered the shooting to have been an act of premeditated murder; certainly, nothing of the kind can reasonably be inferred from the various statements quoted in those articles or from the totality of the latter. Rather, their clear import is that Talbott's family, friends and neighbors were as angry as they could be because they considered the shooting to have been unjustified and unnecessary. It is that import which would be impressed upon a reader of the articles, and which would prevent him from thinking that the father was charging Thuma with premeditated murder, just as the import of the accusation of "blackmail" in *Greenbelt*, rather than that word's technical legal definition,

---

3. See e. g., the portions of Irwin's testimony appearing at Tr. 48 at line 13 to Tr. 53 at line 8; Tr. 56 at line 20 to Tr. 58 at line 7; Tr. 60 at line 15 to Tr. 63 at line 20; and Tr. 66 at line 10 to Tr. 66 at line 14.

4. Tr. 50.

5. Tr. 66.

6. Tr. 52–53.

7. Tr. 66–68.

8. Tr. 50.

was controlling therein. As the Fourth Circuit has recently written, *"New York Times,* in its application, does not interdict legitimate or normal hyperbole." Time, Inc. v. Johnston, 448 F.2d 378, 384 (4th Cir. 1971), *citing* Sellers v. Time, Inc., 299 F.Supp. 582, 585 (D.C. Pa.1969).

In Time, Inc. v. Johnston, *supra,* the plaintiff, a "public figure," [9] was a former professional basketball player, who had been a "star" during the period in which Bill Russell, who subsequently became a "super-star," first began playing. Nine years after Johnston retired from professional basketball, the defendant's publication, Sports Illustrated, published statements attributed to Arnold "Red" Auerbach, who had coached Russell for many years, to the effect that when Russell first played against Johnston, Russell had "destroyed" or "psychologically destroyed" Johnston. Judge Donald Russell (at 385) described the words complained of by Johnston as "hyperbole" and wrote that "taken in *their proper context, [those words* meant] merely that Russell had completely outplayed and over-shadowed the plaintiff, not that Russell had literally 'destroyed' him." [10]

The shooting in the instant case was a matter of public interest. Thuma was a "public official." The father's comment on that shooting was, plaintiff concedes, accurately quoted. Moreover, the father's reaction was itself an issue of concern to the public. The incident was a particularly tragic one, occurring as it did within sight of the Talbott home shortly after the Talbott boy had behaved violently in that home and had caused several members of that family to become frightened both for themselves and for the boy. The latter was subsequently *shot after running from the backyard of that house.* His father, at the time those events occurred, was in a hospital recovering from a heart attack. Following the shooting, the Talbott boy was rushed to that very same hospital where he died in the emergency room. The son's hospitalization and death were not made known to his father until later. Thus, entirely apart from the issue of whether the shooting was justified, there were elements of personal tragedy which were of themselves of interest to the reading public, and which might not have been present had Talbott died under different circumstances. Under those circumstances, the father's reaction was itself a matter of public interest. [11]

For the reasons set forth in this opinion, this Court holds that defendant's publication of the two articles and the statements therein may not be penalized under the standards of *New York Times* and its progeny. Therefore, Hearst's motion for summary judgment is hereby granted.

It is so ordered.

---

9. Judge Russell defined those words, discussed Johnston's continuing status as a "public figure" 448 F.2d at 380–381, and concluded that the principles of *New York Times* were applicable.

10. "To deny to the press the right to use hyperbole, under the threat of removing the protecting mantle of *New York Times,* would condemn the press to an arid, desiccated recital of bare facts." Time, Inc. v. Johnston, *supra* at 384.

11. Irwin testified at his deposition hearing that he felt "obligated" (Tr. 58) as a reporter to inform the public of the reaction of the Talbott household to the killing (Tr. 61).