Thomas S. ROCHE and Marylou Roche

v.

Robert W. EGAN, Geraldine A. Egan, Frederick L. Brown, Sandra J. Brown, Frank J. Fulhan, Jr., and Josephine A. Fulhan.

Supreme Judicial Court of Maine.

Argued Jan. 6, 1981.

Decided Aug. 12, 1981.

Michael J. LaTorre, orally, Portland, Alton L. Yorke, South Portland, for plaintiffs.

Drummond & Drummond, Horace W. Horton, orally, Portland, for defendants.

Before WERNICK, GODFREY, NICHOLS, GLASSMAN,* ROBERTS and CARTER, JJ.

WERNICK, Justice.

A jury in the Superior Court (Cumberland County) found that defendants Robert and Geraldine Egan, Frederick and Sandra Brown, and Frank and Josephine Fulhan committed a libel against plaintiff Thomas S. Roche, which caused damages to both him and his wife, plaintiff Marylou Roche. Awarding each of them compensatory damages, the jury also awarded punitive damages to plaintiff Thomas Roche. A judgment was entered against each defendant from which that defendant has appealed.

We conclude that there was a critical ambiguity in the rationale underlying the verdict form regarding damages, in consequence of which judgments were entered that do not clearly show the total amount of damages plaintiffs are entitled to recover. We also conclude that as to the liability of defendants to plaintiffs, the presiding justice gave instructions to the jury that were not in accord with constitutional requirements. We therefore sustain each appeal, set aside the judgment against each defendant, and remand the case to the Superior Court for further proceedings.

Plaintiff Thomas Roche is a detective of the South Portland Police Department. At trial, the uncontradicted testimony of his colleagues praised Roche as a dedicated, capable and level-headed officer who had received at least a dozen citations for outstanding police work. In the discharge of

*GLASSMAN, J., sat at argument and participated in conference but died before the opinion was adopted.

his primary duties to investigate crimes and to arrest criminal offenders, Roche, who was on call twenty-four hours a day, carried a revolver to and from work. Other than the letter at issue in this case, the South Portland Police Department had never received any complaint about Detective Roche or about his carrying a revolver to and from work.

In early August, 1977 Ralph Segal, Chief of the Department, received a letter, reading:

"Dear Chief Segal:

"We concerned parents are requesting that patrolman Thomas Roche be restricted from carrying a weapon to his residence on 14 Fenway Road, Cape Elizabeth, Maine.

"He has harrassed [sic] neighbors with foul language, has displayed a VIOLENT temper, threatened little children, kicked pets and called the Cape Elizabeth Police Department needlessly. His conduct is most disgraceful, first as a human being and second as a public servant.

"We want it known that we are afraid for the lives of our children and our own around this most disruptive person.

"Very truly yours . . . ."

The letter was signed by the six defendants, neighbors of the plaintiffs on Fenway Road, Cape Elizabeth. It was also signed by Rita and John Slebodnik, former neighbors who had moved out of state before this action was instituted.

Upon receipt of the letter, the Department undertook a formal investigation of Roche's conduct. During the first two weeks of the investigation, complying with a request of the Department, Detective Roche left his revolver at the station instead of carrying it home.

Sergeant Robert Schwartz conducted the Department investigation. He testified at trial that the responses he received during interviews with the defendants seemed rehearsed, that he could find no substance to any of the charges made in the letter, and that there apparently was a "problem" in the neighborhood but it was unrelated to the wrongdoing alleged against Detective Roche.[1]

Plaintiffs emphatically denied the truth of every allegation in defendants' letter. Perhaps what was the gravest of the allega-

---

1. The testimony of witnesses for plaintiffs, which the verdict of the jury shows was believed, gave the following account of the neighborhood and its "problem."

During the time the Roche family lived in this particular neighborhood in Cape Elizabeth, it suffered unexplained, unprovoked "[h]arassment day after day after day." On four different evenings in a row one of the defendants was heard to call out: "[W]e can come out on the porch tonight and sit down kids because the pig is out back. The air is not polluted. The dirty rotten pig is out in his back yard." The same defendant was observed repeatedly taunting nine-year old Susan Roche with a threat of "getting" Susan's cat and having it "gassed", telling another child to "beat" Susan Roche until blood was drawn, and urging the child of two other defendants, who appear to have been rarely at home, to "go do stuff" to the Roche family.

"Stuff" was done on what gradually became a daily basis. When Mrs. Roche would appear outside, children of the defendants would taunt her with obscene gestures and vindictive names; when she would remain inside, snowballs, rocks, and rotten eggs were hurled against her home. The Roches' children suffered repeated teasing and abuse at the neigh-

borhood bus stop. By the summer of 1977, Mrs. Roche appeared to be near a nervous breakdown. On one evening Thomas Roche requested a neighbor to sit with his wife, asking in a cracking voice why they were objects of such hostility and what he had done to deserve it.

To Roche's question, the record yields little answer. One of the witnesses whose testimony related to this question was David Cavalero, former occupant and seller of the Roche home. Cavalero, on hearing of what he described as the "investigation in[to] Tom Roche's conduct as a police officer", wrote an unsolicited letter of sympathy with Roche and sent it to the South Portland Police Department. Cavalero's letter stated that while he was living in the neighborhood, he and his family had suffered "incredible and unprovoked harassment", including "abusive language, snide remarks, lies" and disregard of property; that the children of the offenders had been taught to act and speak as their parents did; and that, for their peace of mind and the well-being of their own children, Cavalero and his family had been "literally forced to move."

By the time this action was under way, the Roches, too, were living in another part of Cape Elizabeth.

tions conveyed was one not expressly stated but obviously implied: Thomas Roche is too hot-tempered, violent, and unstable a person to be safely entrusted with a police weapon in his neighborhood; he might shoot somebody, possibly a child.[2]

### 1.

■ We consider, first, the difficulty that requires us to set aside the award of damages.

In a special verdict form the jury was asked to specify an amount of damages it assessed against *each* defendant. The jury completed the verdict form in a manner showing that it found *each* defendant liable (a) to plaintiff Thomas Roche for $2,000 compensatory damages and also for $4,000 punitive damages, and (b) for $1,500 compensatory damages "for the benefit of plaintiff Marylou Roche" (for her loss of consortium).

In purported correspondence with these jury findings, twelve separate judgments were entered on the Superior Court docket. In favor of plaintiff Thomas Roche a separate judgment for $6,000 damages was entered against *each* of the six defendants; in favor of plaintiff Marylou Roche a separate judgment for $1,500 compensatory damages was entered against *each* of the six defendants.

The problem we confront is that had the jury's intention been to award to plaintiff Thomas Roche an aggregate total amount of $12,000 compensatory damages and of $24,000 punitive damages, and to plaintiff Marylou Roche an aggregate total amount of $9,000 compensatory damages, the evidence in this case would support that amount of damages. The problem is compounded because the verdict form nowhere called for the jury to state a *total amount* of damages each plaintiff was entitled to recover. In short, the way the verdict form was set up may well have misled the jury into *apportioning* intended total recoveries

of $36,000 and $9,000 in equal shares among the six defendants.

On the other hand, and again the record affords us no basis for knowing one way or the other, the jury may not at all have apportioned a total award. Rather, the jury may have decided, and the determination would not have been irrational on the evidence, that plaintiff Thomas' total recovery should be only $6,000 ($2,000 compensatory and $4,000 punitive damages) and plaintiff Marylou's total recovery should be only $1,500 compensatory damages. On this alternative, the judgments entered on the docket would reflect the situation as being that a satisfaction of the amount specified in any one particular judgment in favor of Thomas would constitute a satisfaction of each other judgment in favor of Thomas, and a satisfaction of one particular judgment in favor of Marylou would constitute a satisfaction of each other judgment entered in her favor. *See, e. g., Hutchins v. Emery*, 134 Me. 205, 207, 183 A. 754 (1936).

Defendants brought this problem to the attention of the presiding justice in a motion they filed asking for judgment notwithstanding the verdict of the jury or, alternatively, for a new trial. The justice denied the motion, and defendants raise the issue again in this appeal.

The source of the difficulty confronting us is that the plaintiffs and the presiding justice, but not the defendants, proceeded on the rationale that the defendants in this case were not joint or concurrent tortfeasors who had caused a single injury but, rather, were independently acting tortfeasors each causing a separate injury. This was error of law; in this case defendants acted jointly, or concurrently, to cause a single injury.

■ Maine adheres to the widely recognized common law rule that a jury may not apportion damages for a single injury caused by joint, or concurrent, tortfeasors. *See, e. g., Currier v. Swan*, 63 Me. 323

---

**2.** This obvious implication of the letter, the avowed purpose of which was to restrict Detective Roche from carrying a gun to his home, flows from the letter's having been written by persons who referred to themselves as "parents" being "concerned" about a man who "threatened little children" for whose lives the parents "are afraid."

(1873). That rule was designed not to protect such tortfeasors but, rather, to assure that a plaintiff who is unable to collect the amount of the judgment from one joint, or concurrent, tortfeasor can collect it from another.

Where, within the framework of the verdict, there is a clear basis for discerning an aggregate, or gross, amount of damages as the intended total recovery of damages for a single injury, we have not hesitated to strike an attempted apportionment, treating it as a mere recommendation or surplusage. *Currier v. Swan, supra; see also Atherton v. Crandlemire,* 140 Me. 28, 33 A.2d 303 (1943). In the present situation, however, we cannot tell the total amount of damages intended to be awarded. As we have already mentioned, the verdict form nowhere called for the jury to specify a *total* amount of damages each plaintiff was entitled to recover. In addition, nothing was said to the jury in the presiding justice's instructions about the rationale underlying the verdict form: *i. e.,* whether it called upon the jury (a) to award against *each* defendant the *total amount* for which said defendant was liable for having caused a single indivisible and non-apportionable injury, or (b) to award against each defendant the total amount of damages for *that separate one of six* injuries caused by the separate and independent tortious conduct of that particular defendant (which would have been improper).

Hence, we cannot tell what the jury was intending by its completion of the verdict form: whether it contemplated that the total damages awarded against each defendant be $36,000 to Thomas Roche and $9,000 to Marylou Roche or, rather, that the total damages awarded against each defendant be $6,000 to Thomas and $1,500 to Marylou. We must not substitute our judgment for that of the jury, or even risk doing that by purporting to infer what the jury may have intended. We must, therefore, set aside the damages part of the judg-

ments entered and order a new trial at least on the issue of damages. *See Mixon v. Riverview Hospital,* 254 Cal.App.2d 364, 62 Cal.Rptr. 379 (1967); *Stoewsand v. Checker Taxi Co.,* 331 Ill.App. 192, 73 N.E.2d 4 (1947); *Saucier v. Walker,* 203 So.2d 299 (Miss.1967); *but see Spears v. McKinnon,* 168 Ark. 357, 270 S.W. 524 (1925).

*2.*

The remaining question is whether a new trial may be confined to the issue of damages or whether there must be an entire new trial because of errors in the adjudication of liability.

■ Before the jury retired to consider its verdict, the defendants requested the presiding justice to instruct that Detective Roche was a "public official", within the meaning of *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), and that, therefore, the jury could find that defendants had committed a libel of Detective Roche only if the evidence established with "convincing clarity" that defendants had published their letter in "reckless disregard of the truth." *See Michaud v. Inhabitants of Town of Livermore Falls,* Me., 381 A.2d 1110 (1978).

The holding of *New York Times v. Sullivan, supra,* was that the constitutional guaranties underlying the First and Fourteenth Amendments require

"a federal rule that prohibits a *public official* from recovering damages for a defamatory falsehood *relating to his official conduct* unless he proves that the statement was made with 'actual malice' —that is, with knowledge that it was false or with reckless disregard of whether it was false or not." 376 U.S. at 279–80, 84 S.Ct. at 726 (emphasis added).

In the case at bar, then, two questions were precipitated for the presiding justice by the potential applicability of the *New York Times v. Sullivan* holding:[3] (1) the applica-

---

3. In *Rosenblatt v. Baer,* 383 U.S. 75, 88, 86 S.Ct. 669, 677, 15 L.Ed.2d 597 (1966), the Supreme Court observed:

"[A]s is the case with questions of privilege generally, it is for the trial judge in the first instance to determine whether the proofs show respondent to be a 'public official.'"

bility of the public official concept to a city police detective; (2) the relationship of the alleged libel to a public official's "official conduct", or, as that phrase has since been reformulated by the Supreme Court, to "anything which might touch on . . . [the] official's fitness for office", *see Garrison v. Louisiana,* 379 U.S. 64, 77, 85 S.Ct. 209, 217, 13 L.Ed.2d 125 (1964); *Monitor Patriot Co. v. Roy,* 401 U.S. 265, 274, 91 S.Ct. 621, 626, 28 L.Ed.2d 35 (1971).

The presiding justice characterized Thomas Roche as a "public employee", intending thereby to decide that he was *not* a "public official" for the purposes of the requirements of *New York Times v. Sullivan.* Accordingly, the justice instructed the jury that it could return a verdict against the defendants if it found by a fair preponderance of the evidence that the defendants had acted "negligently."

We decide that this instruction was error and that the error requires the setting aside of the judgment for plaintiffs.

The Supreme Court of the United States has never defined the exact contours of the "public official" concept. Although that Court has stopped short of the conclusion that *all* "public employees" are "public officials", *see Hutchinson v. Proxmire,* 443 U.S. 111, 119 n.8, 99 S.Ct. 2675, 2680 n.8, 61 L.Ed.2d 411 (1979), it has nevertheless emphasized that

> "the 'public official' designation applies at the very least to those among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs." *Rosenblatt v. Baer,* 383 U.S. 75, 85, 86 S.Ct. 669, 676, 15 L.Ed.2d 597 (1966).

Law enforcement is a uniquely governmental affair. The police detective, as one charged with investigating crimes and arresting the criminal, is in fact, and also is generally known to be, vested with substantial responsibility for the safety and welfare of the citizenry in areas impinging most directly and intimately on daily living: the home, the place of work and of recreation, the sidewalks and streets. The nature and extent of the responsibility of a police detective is punctuated by the fact that a firearm, no less than a badge, comes with his office.

Our research has disclosed that every court that has faced the issue has decided that an officer of law enforcement, from ordinary patrolman to Chief of Police, is a "public official" within the meaning of federal constitutional law. *See, e. g., Meiners v. Moriarity,* 563 F.2d 343 (7th Cir. 1977); *Thuma v. Hearst Corp.,* 340 F.Supp. 867 (D.Md. 1972); *Jackson v. Filliben,* 281 A.2d 604 (Del.1971); *Coursey v. Greater Niles Township Publishing Corp.,* 40 Ill.2d 257, 239 N.E.2d 837 (1968); *Kidder v. Anderson,* 354 So.2d 1306 (La.1978), *cert.denied* 439 U.S. 829, 99 S.Ct. 105, 58 L.Ed.2d 123 (1978); *Gilligan v. King,* 48 Misc.2d 212, 264 N.Y.S.2d 309 (1965); *Colombo v. Times-Argus Ass'n. Inc.,* 135 Vt. 454, 380 A.2d 80 (1977); *Starr v. Beckley Newspapers Corp.,* 157 W.Va. 447, 201 S.E.2d 911 (1974). *See generally Annot.* 19 A.L.R.3d 1361 § 5(d) (1968 and Supp. 1980).

The Supreme Court, in the course of deciding other issues emerging from *New York Times v. Sullivan, supra,* has not hesitated to accept such decisions by federal and state courts. *See Time, Inc. v. Pape,* 401 U.S. 279, 91 S.Ct. 633, 28 L.Ed.2d 45 (1971); *St. Amant v. Thompson,* 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968). In *Henry v. Collins,* 380 U.S. 356, 85 S.Ct. 992, 13 L.Ed.2d 892 (1965), the Supreme Court itself applied the requirements of *New York Times v. Sullivan* to a law enforcement officer.

Plaintiffs maintain, alternatively, that despite Thomas Roche's status as a "public official", defendants' conduct should not be judged by the *New York Times v. Sullivan* criteria because, here, the libelous letter was directed not at his official responsibilities but rather at his purely private, off-

And *see Logan v. District of Columbia,* 447 F.Supp. 1328, 1331, (D.D.C. 1978); *Clawson v.*

*Longview Publishing Co.,* 91 Wash.2d 408, 423, 589 P.2d 1223, 1226 (1979).

duty conduct. Plaintiffs point out that the language in *Garrison v. Louisiana, supra,* embracing within the "public official" standard "anything that might touch on an official's fitness for office" is too broad to be mechanically applied. To preserve for Officer Roche some right to an action for purely private defamation, the plaintiffs advocate the approach of the *Restatement of Torts*:

> "The extent to which a statement as to his private conduct should be treated as affecting him in his capacity as a public official cannot be reduced to a specific rule of law. The determination depends upon both the nature of the office involved, with its responsibilities and necessary qualifications, and the nature of the private conduct and the implications that it has as to his fitness for the office. *Thus a statement that the governor drinks himself into a drunken stupor at home every night much more clearly affects his qualifications than a statement that a tax assessor keeps a secret collection of pornographic pictures.*" Restatement (Second) of Torts § 580–A, comment b (1977) (emphasis added).

It may well be that the "fitness for office" language used in *Garrison* should not be mechanically applied.[4] Yet, even were we to assume that the letter's explicit charges—harassing neighbors with foul language, displaying a violent temper, threatening little children, kicking pets, and needlessly calling the Cape Elizabeth Police Department—remain in the realm of purely private defamation,[5] the most serious complaint, that Detective Roche was too unstable to be safely entrusted in the neighborhood with an official weapon, unquestionably impugns his "fitness for office."[6] Moreover, the letter on its face unequivocally states that Detective Roche's "conduct is most disgraceful . . . as a human being and . . . as a public servant."

In these circumstances we need not decide whether it is always, and exclusively, the judge who makes the determination that the published matter does, or does not, relate to "anything which might touch on . . . [the public official's] fitness for office", or whether aspects of that determination are properly to be left to the fact-finder under appropriate instructions from the judge. We decide that, here, the content of

---

**4.** The plaintiffs cite *Aku v. Lewis,* 52 Haw. 366, 477 P.2d 162 (1970) in support of their position that *New York Times* was not meant to constrict defamation actions based on statements concerning the "unofficial" conduct of a "public official." In *Aku* a defendant news broadcaster charged over the air that the plaintiff, who the defendant did not know was a policeman, was fraudulently using a fellow broadcaster's trade name in order to raise funds for a Pop Warner football team. The court held that, although the plaintiff was a "public official", the defendant's statement related solely to the plaintiff's unofficial, private conduct as youth football coach. *New York Times* was thus found inapplicable. Had the court relied on *Garrison,* mechanically applying the "fitness for office" test, the result in *Aku* might have been different. *See also Tucker v. Kilgore,* 388 S.W.2d 112 (Ky.1964) (*New York Times* inapplicable to charges that plaintiff police officer who had removed black defendant from fraternal meeting was a member of a racist organization, was a "moocher", and lacked the nerve to arrest defendant).

We distinguish these cases primarily on the ground that in our view any statement to a police officer's superior expressing concern

about that officer's official weapon must bear upon his "fitness for office."

**5.** Not all the testimony unambiguously confirms that the incidents which allegedly gave rise to the letter occurred while Officer Roche was off duty. For example, a child of two of the defendants claimed that once, while he was riding his bicycle, Officer Roche ran him off the road with his car. The same child also asserted that Thomas Roche had unjustifiably queried him about shoplifting while the latter was performing overtime guard duties in uniform at the Maine Mall.

The charge of needless calling of the Cape Elizabeth Police Department, regardless of whether such calls occurred on or off duty, can be interpreted as a charge of abusing the leverage conferred upon the plaintiff solely by virtue of his office. *Cf. Cabin v. Community Newspapers, Inc.,* 27 A.D.2d 543, 275 N.Y.S.2d 396 (1966) (defamatory charge that school board member prevailed upon teacher to upgrade the marks of member's son).

**6.** Chief Segal cogently made the point by his testimony that the detective who cannot be trusted in taking home his gun will cease being a detective.

the letter itself is sufficiently plain to foreclose as rational any conclusion other than that the defamatory matter, as published, touched upon Thomas Roche's fitness for office. As a matter of law, in short, the plain meaning of the statements objectively expressed overrides any purely subjective intent to the contrary that one or more of the defendants who signed the letter may have mentioned. Hence, nothing was legitimately open for determination by the jury as fact-finder.

Plaintiffs' last argument to sustain the adjudication of liability focuses on the jury's having awarded *punitive* damages. Plaintiffs contend that any error arising because the presiding justice refused to give the instruction as to liability required by *New York Times v. Sullivan, supra,* must be deemed cured by the jury's having awarded *punitive damages.* The argument is that the criterion under Maine law to justify an award of punitive damages, as to which plaintiffs say the justice correctly instructed the jury, encompasses the factual findings required by *New York Times v. Sullivan* regarding liability. *See Curtis Publishing Co. v. Butts,* 388 U.S. 130, 156–57, 87 S.Ct. 1975, 1992, 18 L.Ed.2d 1094 (1967).

Here, the justice charged as to punitive damages in pertinent part as follows:

> "[I]n order to recover punitive damages, it must be *clear and convincing evidence that the defendants acted with actual malice* in publishing the . . . letter.
>
> \*   \*   \*   \*   \*   \*
>
> "*A publication is made with actual malice as that term is used if it is made with knowledge that it is false or with reckless disregard of whether it is false or not,* a wrongful act known to be such and intentionally done without cause or excuse constitutes malice." (emphasis added)

The justice continued:

> "Absence of probable cause [to believe the letter's statement] may serve as evidence of malice, but it is not identical with malice and you, as factfinders, are not obligated to infer malice from the absence of probable cause. Such an inference is proper only when the absence of probable cause establishes in your minds *by a fair preponderance of the evidence* that there is malice." (emphasis added)

Arguably, the justice's instructions on punitive damages cannot be relied on to supply what *New York Times v. Sullivan* requires as to liability, if only because the instructions intermixed "clear and convincing evidence" with the standard of "fair preponderance of the evidence." The former, not the latter, is the constitutionally required standard of proof, *e. g., Rosenbloom v. Metromedia, Inc.,* 403 U.S. 29, 30, 91 S.Ct. 1811, 1813, 29 L.Ed.2d 296 (1971).

In any event, even if we assume that the jury found the evidence "clear and convincing" that defendants acted in "reckless disregard of the truth" and therefore should pay punitive damages, we cannot on that basis deem it harmless error that the justice failed to instruct on liability in accordance with the *New York Times* criterion. As we have already decided, the damages part of the judgments cannot stand. A retrial on the issue of damages, at which substantially all of the evidence admitted in this trial is likely to be admitted again, is therefore unavoidable. A second jury, on retrial, might well assess damages differently and find that no punitive damages should be awarded. It would thus be logically inconsistent, and practically incongruous, for us to make the findings of the first jury in assessing damages controlling, and in effect the "law of the case" with respect to liability, while we simultaneously create the opportunity for those very findings to be repudiated, by requiring a second jury to determine what damages shall be awarded. In sum, the only sound solution of the problems presented is a new trial of the entire case.

### 3.

Even though, ordinarily, this disposition of the case would make unnecessary consideration of any of the other errors assigned, we discuss two other issues that could assume importance in another trial.

Defendants have claimed that plaintiffs must show physical injury to Thomas Roche before Marylou Roche can recover for loss of consortium. No direct authority is cited for this singular proposition, and we reject it out of hand.

> "[D]efamation has long been regarded as a form of 'psychic mayhem', not very different in kind, and in some ways more wounding, than physical mutilation." L. Tribe, *American Constitutional Law* 649 (1978).

We therefore perceive no reasoned basis for a holding that would make physical injury, as such, a touchstone of recovery for loss of consortium. *Cf. Vicnire v. Ford Motor Credit Co.*, Me., 401 A.2d 148, 154 (1979).

Defendants have also contended that the presiding justice committed error in refusing to instruct, as requested, on the privileges of a person living in a community (1) to make statements to a police officer (Chief Segal) for the purpose of protecting one's property, *see, e. g., Parker v. Kirkpatrick*, 124 Me. 181, 126 A. 825 (1924), and (2) to communicate to a police officer for the purpose of aiding in the detection of crime, *see, e. g., Elms v. Crane*, 118 Me. 261, 107 A. 852 (1919).

These common law privileges are *conditional* privileges; they are lost if the defamatory statements claimed to be thus privileged are not published with an honest belief in their truth, a belief that must be based upon reasonable grounds. *See, Boulet v. Beals*, 158 Me. 53, 177 A.2d 665 (1962) and cases cited therein. Because under *New York Times v. Sullivan, supra*, the defendants can be held liable only if it is shown that they acted with "reckless disregard of the truth", the giving of the *New York Times* instruction we have held necessary will obviate any need for further instructions on the common law conditional privileges. If there *has* been a reckless disregard of the truth, those privileges do not afford protection and therefore cannot affect defendants' liability; if there has *not* been a reckless disregard of the truth, defendants cannot be liable and, therefore, whether or not the conditional privileges would protect them is of no consequence as to their liability.

The entry shall be:

Appeal of each defendant sustained; the judgment against each defendant is set aside; case remanded to the Superior Court for further proceedings consistent with the opinion herein.

All concurring.