Robert A. **MAHEU**, Plaintiff,

v.

**HUGHES TOOL COMPANY**, a corporation, et al., Defendants.

Civ. No. 72–305–HP.

United States District Court,
C. D. California.

Oct. 18, 1974.

**168**

Morton R. Galane, Galane, Tingey & Shearing, Las Vegas, Nev., Hurley & Grassini, North Hollywood, Cal., for plaintiff.

Norbert A. Schlei, Hughes, Hubbard & Reed, Los Angeles, Cal., and Howard M. Jaffee, Davis & Cox, New York City, for defendants.

## MEMORANDUM AND ORDER GRANTING SUMMA'S MOTION FOR PARTIAL SUMMARY JUDGMENT RE PUNITIVE DAMAGES

PREGERSON, District Judge.

This is a defamation action brought by plaintiff, Robert A. Maheu, against defendant, Hughes Tool Company, now known as Summa Corporation, to recover compensatory and punitive damages.

On July 1, 1974, after a four month bifurcated trial, requested by Summa, the jury returned a verdict in favor of Maheu on the issue of liability.[1] The second phase of this action to determine Maheu's damages and to dispose of Summa's counterclaims is now scheduled for trial before the same jury for October 29, 1974.

The matter now before the court is Summa's motion for partial summary judgment, filed August 22, 1974, pursuant to F.R.Civ.P. 56(a), which challenges the constitutionality of punitive damages in a defamation action involving a public figure plaintiff when liability is founded upon actual malice.

The defamatory statements which sparked this lawsuit were uttered on January 7, 1972, by Howard R. Hughes during a telephonic press conference with seven newsmen at the Sheraton Universal Hotel. Hughes' defamatory utterance is contained in the following colloquy:

"Q. Was Maheu fired on your orders and because of

A. (Answer not audible)

MR. NEAL: Would you ask him to repeat that, please.

Q. Would you repeat that, please.

A. Specifically.

Q. Why?

A. Because he's a no-good, dishonest son-of-a-bitch, and he stole me blind.

---

1. On January 12, 1973, the court filed its memorandum and order granting Summa's motion, pursuant to F.R.Civ.P. 42(b), for a separate trial on the issue of truth.

Q. Thank you. Mr. Hughes, this is your first news conference in how long?

A. I don't suppose I ought to be saying that at a news conference, but I just don't know any other way to answer it. If you, if you would even —you wouldn't think it could be possible with modern methods of bookkeeping and accounting and so forth for a thing like the Maheu theft to have occurred, but believe me it did, because the money is gone and he's got it."

Prior to the liability trial, Summa admitted that the utterance of those words by Hughes satisfied all elements necessary to fix its liability for damages for defamation, except for the overriding issue of truth. In other words, Summa conceded legal responsibility for the utterance, admitted publication, and agreed that the utterance was defamatory if found by the trier of fact to be untrue. Moreover, Summa assumed the burden of proof on the truth issue and conceded that if it did not prevail on that issue at trial, Summa would be deemed to have acted with actual malice, i. e., that it had knowledge of falsity or acted in reckless disregard of the truth.[2] See New York Times v. Sullivan, 376 U. S. 254, 279–280, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Furthermore, in the Pretrial Conference Order Re Trial of Truth Issue, filed February 19, 1974, the parties stipulated that both plaintiff and defendant were public figures and that the subject matter of Maheu's termination was a matter of public or general concern.

■ Defendant's present motion for partial summary judgment on punitive damages raises an issue of first impression. This court must decide whether the First Amendment to the United States Constitution precludes the recovery of punitive damages when the plaintiff is a *public figure* and liability is founded upon *actual malice*. Having studied the briefs of both parties and having heard oral argument on September 9, 1974, this court concludes that punitive damages in this context have a chilling effect on freedom of speech, and that these arbitrary awards do not narrowly and necessarily promote an important and substantial state interest. Therefore, plaintiff Maheu may not recover punitive damages in this action.

In recent opinions, the United States Supreme Court has questioned the constitutional propriety of punitive damages for defamation. *See* Gertz v. Welch, 418 U.S. 323, 94 S.Ct. 2997, 3011, 41 L.Ed.2d 789 (1974); Rosenbloom v. Metromedia, Inc., 403 U.S. 29, 59, 91 S. Ct. 1811, 29 L.Ed.2d 296 (White, J. concurring), 65–78 (Harlan, J. dissenting), 82–86 (Marshall and Stewart, J.J. dissenting) (1971); *see also* Restatement (Second) of Torts, Explanatory Notes § 621, comments *b* and *f*, at 286 and 288 (Tent. Draft No. 20, 1974). The most recent decision, Gertz v. Welch, *supra*, involved a private figure plaintiff who had not shown actual malice as defined by New York Times v. Sullivan, *supra*. In *Gertz*, after holding that "the States may not permit recovery of presumed or punitive damages, at least when liability is not based on a showing of knowledge of falsity or reckless disregard for the truth," 94 S.Ct. at 3011, the court discussed the practical effect of punitive damages as follows:

In most jurisdictions jury discretion over the amounts awarded is limited only by the gentle rule that they not be excessive. Consequently, juries assess punitive damages in wholly unpredictable amounts bearing no necessary relation to the actual harm caused. And they remain free to use their discretion selectively to punish expressions of unpopular views.

94 S.Ct. at 3012.

A similar discussion of punitive damages may be found in Justice Marshall's dissenting opinion in Rosenbloom v. Metromedia, Inc., *supra*, 403 U.S. at 83–86,

2. See this court's January 12, 1973 "Memorandum and Order Granting Separate Trial on Issue of Truth," p. 3.

91 S.Ct. 1811. In this opinion, Justice Marshall states:

> The manner in which unlimited discretion may be exercised is plainly unpredictable. And fear of the extensive awards that may be given under the doctrine must necessarily produce the impingement on freedom of the press recognized in *New York Times*.
>
> \* \* \* \* \* \*
>
> The unlimited discretion exercised by juries in awarding punitive . . . damages compounds the problem of self-censorship that necessarily results from the awarding of huge judgments. This discretion allows juries to penalize heavily the unorthodox and the unpopular and exact little from others. Such free wheeling discretion presents obvious and basic threats to society's interest in freedom of the press. And the utility of the discretion in fostering society's interest in protecting individuals from defamation is at best vague and uncertain. These awards are not to compensate victims; they are only windfalls.

403 U.S. at 83 and 84, 91 S.Ct. at 1839.

■■ The foregoing analysis demonstrates the chilling effect that punitive damages have on the exercise of First Amendment rights. Individuals "steer far wider of the unlawful zone," Speiser v. Randall, 357 U.S. 513, 526, 78 S.Ct. 1332, 1342, 2 L.Ed.2d 1460 (1958), and forego the exercise of constitutionally protected speech when threatened by the award of unlimited discretionary punitive damages. This threat becomes even more ominous when viewed in the context of costly litigation and the attendant potential recovery of substantial compensatory damages. Moreover, the chilling effect exists whether or not the plaintiff is required to show actual malice in accordance with New York Times v. Sullivan, *supra*. Although the *New York Times* rule provides the publisher with greater protection at the threshold of liability, it does not cure the self-censorship effect of punitive damages. Before

speaking, the publisher must still consider the risk of unlimited recovery in the event the plaintiff satisfies the requirement of actual malice. This risk is increased when the publisher expresses unpopular views. Under this circumstance, the jury could find the existence of actual malice more because it objects to the views expressed by the publisher than because he in fact acted with knowledge of falsity or reckless disregard of the truth. Aside from the specter of unlimited recovery, these gratuitous awards invite lawsuits. Regardless of the merits or extent of actual injury, some plaintiffs may be willing to trigger expensive litigation when the jackpot of open-ended recovery looms in the background. For these reasons, the court believes that the availability of exemplary damages promotes self-censorship despite the higher threshold of liability imposed by *New York Times*. Therefore, this court cannot sustain punitive damage awards in public figure defamation actions unless they narrowly and necessarily further important and substantial state interests. *See* Keyishian v. Board of Regents, 385 U.S. 589, 602–604, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967); United States v. O'Brien, 391 U.S. 367, 376–377, 381, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968); Baird v. State Bar of Arizona, 401 U.S. 1, 6–7, 91 S.Ct. 702, 27 L.Ed.2d 639 (1971); Shelton v. Tucker, 364 U.S. 479, 488–490, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960); *cf.* Dunn v. Blumstein, 405 U.S. 330, 343–344, 92 S. Ct. 995, 31 L.Ed.2d 274 (1972).

■ There are several state interests which punitive damages in defamation actions might vindicate. First, these awards might serve the state's interest in the protection of reputation against harm. However, the prospect of protracted and expensive litigation and the award of compensatory damages adequately serve this same interest. Thus, the addition of punitive damages to promote this deterrent purpose is unnecessary under ordinary circumstances. In this regard, it should be added that the *Gertz* decision does not diminish the de-

terrent effect of compensatory damages. This opinion catalogs a very broad range of compensable items capable of yielding substantial awards for successful plaintiffs:

> We need not define "actual injury," as trial courts have wide experience in framing appropriate jury instructions in tort action. Suffice it to say that actual injury is not limited to out-of-pocket loss. Indeed, the more customary types of actual harm inflicted by defamatory falsehood include impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering. Of course, juries must be limited by appropriate instructions, and all awards must be supported by competent evidence concerning the injury, although there need be no evidence which assigns an actual dollar value to the injury.

94 S.Ct. at 3012. Therefore, even if we assume that the Supreme Court's elimination of presumed damages in *Gertz, supra* at 3011, applies to public figure defamation actions, the deterrent impact of these "actual damages" cannot be minimized.[3]

◼ Moreover, the state's interest to safeguard the reputation of public figures is not clearly compelling or substantial. As *Gertz, supra* at 3009–3010, points out, public figures generally have access to channels of effective communication. Consequently, they have an opportunity to rebut defamatory statements through the news media. In addition, *Gertz* suggests that public figures have relinquished a part of their reputational interest by thrusting themselves "to the forefront of particular public controversies," or by securing positions of substantial power and influence. 94 S.Ct. at 3009. In so doing, they "have voluntarily exposed themselves to increased risk of injury from defamatory falsehoods concerning them." 94 S.Ct. at 3010. Under these circumstances, it is appropriate to conclude that "the desire and right of the public to know," W. Prosser, Handbook of the Law of Torts, § 118, p. 824 (4th ed. 1971), and the constitutional guarantee of freedom of speech outweigh the state's interest in the protection of reputation that has been minimized by the public figure's special capacity to rebut and by that figure's voluntary exposure to public comment.

◼ The second state interest which punitive damages might serve in the law of defamation is the protection of privacy. Rosenbloom v. Metromedia, Inc., *supra,* 403 U.S. at 48, 91 S.Ct. 1811; Rosenblatt v. Baer, 383 U.S. 75, 92, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966). Under the logic of *Gertz,* however, the privacy interest of public figures does not substantially justify the chilling effect of punitive damages. Since public figures are described as those who have invited attention, comment, and publicity by occupying positions of influence or by thrusting themselves onto the stage of community affairs, it may be persuasively argued that they have consented to public invasions of their privacy or that they have made their private personality and affairs matters of public business. Gertz v. Welch, *supra,* 94 S.Ct. at 3005; *See also* Rosenbloom v. Metromedia, *supra,* 403 U.S. at 48, 91 S.Ct. 1811; Prosser, *supra* at 824.

Therefore, the state's interest in the protection of reputation and privacy of public figures is not important or compelling under ordinary circumstances and, therefore, does not justify the chilling effect of punitive damages.

◼◼ Despite the foregoing considerations, there may be certain aggravated circumstances under which the state's interest in the protection of reputation

---

3. *See also Gertz,* 94 S.Ct. at 3020–3021 where Justice Brennan states in his dissenting opinion: "Moreover, the Court's broad-ranging examples of 'actual injury,' including impairment of reputation and standing in the community, as well as personal humiliation, and mental anguish and suffering, inevitably allow a jury bent on punishing expression of unpopular views a formidable weapon for doing so."

and privacy justifies the award of punitive damages in defamation actions. These aggravated circumstances arise only when reputation and privacy are threatened by the special dangers flowing from highly motivated, tortious conduct, i. e., reprehensible conduct that is motivated by ill will, or is accompanied by malice, fraud, or oppression.[4] See Cal.Civ.Code § 3294 (West 1970); Davis v. Hearst, 160 Cal. 143, 116 P. 530, 539 (1911); Wolfsen v. Hathaway, 32 Cal.2d 632, 198 P.2d 1, 12 (1948); Bucher v. Krause, 200 F.2d 576, 587 (7th Cir. 1952). When a tort is perpetrated under aggravated circumstances the state may appropriately conclude that there is a greater probability that harm will be inflicted and that the magnitude of harm will be larger. For these reasons, the state could conclude that the compensatory and deterrent functions of actual damages are insufficient to protect its residents from the higher potential for harm flowing from malicious conduct, and that an additional deterrent to discourage such behavior is necessary. The method selected by the state to meet these special dangers of malicious behavior is the private fine of punitive damages. Under the above analysis, therefore, it appears that (1) the state has an interest to protect reputation and privacy of its residents from the special dangers flowing from highly motivated tortious defamation and that (2) punitive damages are the means chosen to serve this purpose.

■ Having isolated the specific state interest served by punitive damages, the court must consider whether that interest, as it applies to public figure defamation actions, is important and substantial. The Supreme Court has relegated the public figure's interest in reputation and privacy to a minimal level of protection by requiring him to show actual malice in order to recover compensatory damages. The Court has rationalized this result, in part, by relying upon the public figure's voluntary exposure to public comment and his ability to rebut defamatory utterances through the news media. Gertz v. Welch, supra at 3009. Just as these considerations minimize the state's general interest in the protection of a public figure's reputation and privacy, so they also tend to diminish the special dangers that might flow from highly motivated defamation. Because the public figure normally has access to the news media to rebut aggravated defamatory utterances, such tortious defamation of public figures does not increase the likelihood and magnitude of injury as much as similar aggravated or malicious defamation directed at private individuals. Similarly, the state's interest in protecting the public figure's reputation and privacy from the special dangers flowing from malicious defamation is decreased by that figure's voluntary exposure to such dangers. These considerations suggest that the additional state interest to protect reputation and privacy from special dangers arising out of highly motivated tortious defamation is not compelling or substantial in public figure actions.

■ In any event, the court prefers to rest its holding on the determination that punitive damages do not narrowly and necessarily promote this particular state interest. See Keyishian v. Board of Regents, supra; United States v. O'Brien, supra. The decision to award punitive damages is wholly within the control of the jury and is committed to its "untrammeled discretion." Davis v. Hearst, 160 Cal. 143, 116 P. 530, 543 (1911); see also Shumate v. Johnson Publishing Co., 139 Cal.App.2d 121, 293 P.2d 531 (2d Dist.1956); Alterauge v. Los Angeles Turf Club, 97 Cal.App.2d 735, 218 P.2d 802 (2d Dist.1950). Although punitive damages must bear a "reasonable relationship" to actual damages, Luke v. Mercantile Acceptance

---

4. *Gertz* recognized this function of punitive damages when it refused to permit their award "at least" in the absence of a showing of actual malice and emphasized that punitive damages "are private fines levied by civil juries to punish *reprehensible* conduct and to deter its future occurrence." 94 S. Ct. at 3012 (emphasis added).

Corp., 111 Cal.App.2d 431, 244 P.2d 764, 769 (1952); Brewer v. Second Baptist Church, 32 Cal.2d 791, 197 P.2d 713 (1948), there is no fixed ratio by which to determine a proper proportion between the two classes of damages. Ferraro v. Pacific Finance Corp., 8 Cal. App.3d 339, 353, 87 Cal.Rptr. 226, 235 (1st Dist.1970). Under loose standards like these, a jury has unbridled discretion to punish unpopular opinion and a judge has ample freedom to find some undefined "reasonable relationship" to justify the award. *See* Morris, Punitive Damages in Tort Cases, 44 Harv.L.Rev. 1173, 1180 (1931). As a result, these awards may be used broadly to punish free speech. Thus, they are not narrowly limited to the deterrence of malicious, fraudulent, or oppressive conduct.

 It is also clear that the present, overbroad approach to the award of punitive damages is not necessarily required to achieve the state's goal of deterrence. The state could select one of several alternative means to promote its goal and, in so doing, could decrease the chilling impact on First Amendment rights. For example, it might place a dollar limit upon the amount of recoverable punitive damages or confine punitive damages in defamation actions to a particular multiple of actual damages.[5] Finally, the legislature and the courts could seek to deter highly reprehensible conduct by awarding court costs and attorney's fees to the plaintiff.

 Furthermore, the court does not believe that the constitutional defects of discretionary punitive damage awards can be cured by instructing the jury to relate its award to the purpose of deterring malicious conduct. As Justices Marshall and Stewart make clear in their dissenting opinion in Rosenbloom, supra, this task is fraught with difficulties:

Mr. Justice *Harlan* suggests that on a finding of actual malice punitive dam-

ages may be awarded if they "bear a reasonable and purposeful relationship to the actual harm done." My Brother *Harlan* envisions jurors being instructed to consider the deterrent function of punitive damages and to try to gear the punitive damages awarded in some undetermined way to actual injury. Apparently, the jury under the supervision of the court would weigh the content of the speech and the surrounding circumstances— *inter alia,* the position of the plaintiff, the wealth of the defendant, and the nature of the instrument of publication—on the scale of their values and determine what amount is necessary in light of the various interest involved. Since there would be no objective standard by which to measure the jury's decision there would be no predetermined limit of jury discretion and all of the threats to freedom of the press involved in such discretion would remain. The chant of some new incantation will, of course, provide clear authority for a court to substitute its values for the jury's and remake the decision. If this is what my Brother *Harlan* envisions, he is merely moving the ad hoc balancing from the question of fault to the question of damages.

403 U.S. at 85–86, 91 S.Ct. at 1840, 29 L.Ed.2d 296.

 Because it would be difficult to objectively supervise the exercise of the jury's discretion in this tender First Amendment area and because unlimited, discretionary awards of punitive damages do not narrowly and necessarily promote the special state interest to protect the reputation and privacy of public figures from special dangers flowing from highly malicious tortious defamation, *i. e.,* the greater probability that harm will be inflicted and that the magnitude of the harm will be larger, this court concludes that the First Amend-

---

5. It should be noted that the legislature has already enacted a criminal libel statute prescribing a maximum fine of $5,000 or imprisonment not exceeding one year for malicious libel. Cal.Pen.Code § 249 (West 1970).

ment precludes plaintiff's recovery of punitive damages. To the extent that section 3294 of the California Civil Code authorizes this court to grant exemplary damages in public figure defamation actions, it is unconstitutional.

In light of the disposition of this matter, it is unnecessary to decide the other contentions raised in defendant's motion for partial summary judgment.