George T. APPLEYARD, III, Appellee,

v.

TRANSAMERICAN PRESS, INC., d/b/a Overdrive, Appellant.

No. 75–2012.

United States Court of Appeals, Fourth Circuit.

Argued March 29, 1976.

Decided Aug. 5, 1976.

Larry B. Sitton, Greensboro, N. C. (Beverly C. Moore, J. Donald Cowan, Jr., Smith, Moore, Smith, Schell & Hunter, Greensboro, N. C., on brief), for appellant.

Norman B. Smith, Greensboro, N. C. (Smith, Patterson, Follin, Curtis & James, Greensboro, N. C., on brief), for appellee.

Before HAYNSWORTH, Chief Judge, and WINTER and BUTZNER, Circuit Judges.

WINTER, Circuit Judge:

Transamerican Press, Inc. (Transamerican), defendant in this libel action, appeals from an adverse judgment awarding $10,000 compensatory damages and $5,000 punitive damages to plaintiff, George T. Appleyard, III (Appleyard). We affirm.

### I.

Transamerican is the publisher of *Overdrive,* a nationally distributed magazine for truckers. Appleyard originally came into contact with *Overdrive* as part of an effort to change regulations of the Interstate Commerce Commission restricting the carriage of commodities between designated places over designated routes. As a result of conversations between Appleyard and Michael Parkhurst, the editor of *Overdrive,* it was agreed that Appleyard would transport by truck an unauthorized load from Winston-Salem, North Carolina to Washington, D. C. and park this unauthorized load in front of the Interstate Commerce Commission. This action was intended to force the Commission into a test case. Under the initial agreement, *Overdrive* was to finance the costs of litigation either directly or through a legal defense fund that it would establish.

The parties had a falling out, however, over the financing of the suit and the identity of the attorney who was to be employed. As a consequence, Appleyard set up a separate legal fund from that originally established by *Overdrive.* Subsequently, *Overdrive* published two uncomplimentary articles about Appleyard in its January, 1972 issue. The articles falsely suggested that Appleyard had caused the donations to *Overdrive's* defense fund to be diverted to a special bank account established by Appleyard, that some of the funds were diverted to Appleyard's personal use, that some of the funds Appleyard collected went to the personal use of one of Appleyard's associates, etc.

Appleyard then filed this diversity action, claiming that the articles were libelous. The case was tried before a jury, which awarded the plaintiff $10,000 in compensatory damages and $75,000 in punitive damages. On post-trial motions, the district judge remitted the punitive damage award to $5,000.

### II.

Appellant's first contention is that the district court lacked personal jurisdiction over Transamerican. *In personam* jurisdiction over the defendant in this case is based upon North Carolina General Statutes § 1–75.4(3), which provides for jurisdiction when the case arises out of an act committed in the state by the defendant. Under North Carolina law, a new tortious act occurs each time a libelous publication is read in the state. *Johnston v. Time, Inc.,* 321 F.Supp. 837 (M.D.N.C.1970), modified, 448 F.2d 378 (4 Cir. 1971); *Sizemore v. Maroney,* 263 N.C. 14, 138 S.E.2d 803 (1964). Here, the proof showed that copies of the offending articles were sent into North Carolina, and presumably they were read there. Thus, under the applicable long-arm statute, the district court had jurisdiction over the defendant.

However, Transamerican argues that the due process clause of the fourteenth amendment prohibits a North Carolina court from exercising personal jurisdiction over Transamerican in this case. The contention is that Transamerican's connections with North Carolina are so tenuous that requiring it to defend in that state violates the "traditional notions of fair play and substantial justice" which are the touchstones of the due process test for long-arm jurisdiction. *See International Shoe*

*Co. v. State of Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945).

Transamerican is the publisher of a magazine of national, albeit small, circulation. Each month 765 copies of *Overdrive* are distributed in North Carolina. This distribution is not accidental, but part of a calculated, ordered program. Moreover, the articles at issue here were directed at a North Carolina resident, and any damage which misstatements in those articles caused could reasonably be expected to occur in North Carolina. Given these factors, due process standards were not violated by the requirement that Transamerican defend in that state.

### III.

■ Transamerican next contends that there was insufficient evidence to warrant submission of the case to the jury on the issue of liability. Appleyard concedes that he was a public figure at the time that the alleged libel took place. Thus, in order to support the jury's verdict, there must be clear and convincing evidence of actual malice—that is, knowledge of the falsity of statements in the articles or reckless disregard of their truth or falsity. *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

■ One of the statements in the *Overdrive* articles was that "Appleyard had caused the alteration of an appeal for funds in OVERDRIVE, so that donations for the *entire* Legal Defense Fund would be channeled to a special bank account Appleyard set up." (Emphasis in original.) Appleyard testified that he was first informed of the proposed alteration by Jim Drinkhall, an employee of *Overdrive,* and that at that time he expressed his opposition to the change. This testimony provides sufficient

support for the jury's general finding that Transamerican published the "articles and statements complained of by plaintiff . . with actual malice as that term was defined in the instruction," i. e., with either knowledge that the statements were false or reckless disregard for their truthfulness.

### IV.

■ Finally, Transamerican contends that punitive damages should not be allowed in cases involving public figures. *Maheu v. Hughes Tool Co.,* 384 F.Supp. 166 (C.D.Cal.1974), is the only authority to support this position, but we decline to follow it here.[1]

*Maheu* relied in large part on *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). While *Gertz* held that a "private defamation plaintiff who establishes liability under a less demanding standard than that stated by New York Times may recover only such damages as are sufficient to compensate him for actual injury," 418 U.S. at 350, 94 S.Ct. at 3012, we do not read *Gertz* to hold that a public figure plaintiff may not recover punitive damages if he meets the burden of the *New York Times* test. The concurring opinion of Mr. Justice Blackmun in *Gertz* characterizes its holding only as "removing the specters of presumed and punitive damages in the absence of New York Times malice." 418 U.S. at 354, 94 S.Ct. at 3014. The dissenting opinion of Mr. Justice White does not treat the majority view as preventing the award of punitive damages where a plaintiff shows "intentional falsehood or reckless disregard for the truth or falsity of the publication." 418 U.S. at 396, 94 S.Ct. at 3034. While some legal commentators have posited that *Gertz* presages the ultimate abolition of punitive damages for public official and public figure plaintiffs,[2]

---

1. *Maheu* is of questionable authority also in treating plaintiff as a "public figure plaintiff." *See Time, Inc. v. Firestone,* 424 U.S. 448, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976). That aspect of *Maheu,* even if not correct, is not directly relevant here.

2. *See* Comment, Constitutional Law-First Amendment-Punitive Damages in Defamation Actions Brought by Public Figures Chill First Amendment Rights and Are Unconstitutional Unless Narrowly and Necessarily Promoting Compelling State Interest, 28 Vanderbilt L.Rev. 887, 897 (1975); D. Robertson, Defamation and the First Amendment: In Praise of *Gertz v.*

*Gertz* itself did not do so and this fact has been recognized by other commentators.[3]

Nor do we think that the rationale of *Gertz* is applicable here. The purpose of constitutional limitations on the permissible scope of state-law libel is not to protect false statements of fact. *See Gertz*, 418 U.S. at 340, 94 S.Ct. 2997. Rather, the purpose of the *New York Times* rule is to prevent "would-be critics of official conduct [from being] deterred from voicing their criticism, even though it is believed to be true and even though it is in fact true, because of doubt whether it can be proved in court or fear of the expense of having to do so." *New York Times Co.*, 376 U.S. at 279, 84 S.Ct. at 725. This rationale has little application where, as in the instant case, *New York Times* malice has been proven; for where such malice is present there is no good-faith attempt to point out real abuses to the public.[4] There is only an unsubstantiated attack on the character, reputation and good name of a particular individual.

Further, awards of punitive damages advance a valid state goal. Such awards serve to deter others who might engage in malicious false attacks on the public figures. *See generally Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29, 74, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971) (Harlan, J., dissenting). Admittedly such figures may have greater access to the channels of effective communication and, hence, a more realistic opportunity to counteract false statements than private individuals normally enjoy,

*Gertz v. Robert Welch, Inc.*, 418 U.S. at 344, 94 S.Ct. 2997; however, due to their position in the limelight, public figures are also more likely to suffer from malicious attacks than are private citizens.

This is not a case in which the punitive damage award was excessive in relation to the potential harm inherent in the libelous articles. Such a case might raise first amendment problems because of the inherent chilling effect of such disproportionate awards on vigorous criticism of public officials. *See Rosenbloom v. Metromedia, Inc.*, 403 U.S. at 74–75, 91 S.Ct. 1811 (Harlan, J., dissenting). Here, punitive damages amounted to only one-half of compensatory damages. We see no constitutional infirmity in such an award.

*AFFIRMED.*

BUTZNER, Circuit Judge (concurring):

I concur in the court's opinion, but I believe these additional remarks are warranted because of the instructions given by the district court to the jury on the issue of punitive damages.

In *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 349, 94 S.Ct. 2997, 3011, 41 L.Ed.2d 789 (1974), the Court held that a private citizen could recover punitive damages only when a publication was made with "knowledge of falsity or reckless disregard for the truth." This standard, at the very least, is applicable to the recovery of punitive damages by a public figure. *See* Eaton, The American

---

Robert Welch, Inc., 54 Texas L.Rev. 199, 215 (1976).

**3.** Comment, Libel and Slander—A State is Precluded from Imposing Liability Without Fault or Presumed or Punitive Damages in the Absence of *New York Times* Malice, 6 Loyola University Law J. 256, 267 (1975); A. Frakt, The Evolving Law of Defamation: *New York Times Co. v. Sullivan* to *Gertz v. Robert Welch, Inc.* and Beyond, 6 Rutgers Camden Law J. 471, 507 (1975).

**4.** Unlike our concurring brother, we find no error in the instructions under which the issue of awarding punitive damages was submitted to the jury. While we would agree that if those instructions stood alone, some of the language

employed exceeded the *New York Times* test; but they did not stand alone. The jury was instructed how to determine liability and compensatory damages strictly in accordance with *New York Times*. The jury was further told to consider awarding punitive damages *only* if they found liability and awarded compensatory damages. Thus, any consideration of punitive damages was predicated upon the jury's finding knowing falsity or reckless disregard of the truth. The district court's language strayed beyond *New York Times* only when it sought to impress on the jury that, even if it found knowing falsity or reckless disregard of the truth, it was not required to make an award of punitive damages.

Law of Defamation, 61 Va.L.Rev. 1349, 1439–41 (1975).

The district court charged the jury in conformance with *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80, 84 S.Ct. 710, 726, 11 L.Ed.2d 686 (1964), that compensatory damages could be awarded to a public figure only if the defamatory statement were made "with knowledge that it was false or with reckless disregard of whether it was false or not." It did not, however, repeat this admonition in its instructions on punitive damages. Instead, it said in part that punitive damages could be awarded if the defamation were "carelessly published." The court further emphasized that such damages were permissible if the defamatory publication were "intentional, malicious and with the purpose of injuring the Plaintiff." These instructions erroneously departed from the proper standard because they allowed recovery of punitive damages without proof that the defendant knew the defamatory statements were false or that it made them with reckless disregard of their truth or falsity. *Cf. Greenbelt Cooperative Publishing Ass'n. v. Bressler*, 398 U.S. 6, 9–11, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970); *Beckley Newspapers Corp. v. Hanks*, 389 U.S. 81, 82, 88 S.Ct. 197, 19 L.Ed.2d 248 (1967).

Although the defendant objected to the submission of the issue of punitive damages to the jury, it did not comply with Rule 51 of the Federal Rules of Civil Procedure by objecting to the court's test for the recovery of such damages. Most circuits have said that an appellate court may reverse for plain error where necessary to prevent a miscarriage of justice despite the defendant's failure to comply with Rule 51. *Edwards v. Mayes*, 385 F.2d 369, 373 n. 1 (4th Cir. 1967); 9 Wright and Miller, Federal Practice and Procedure § 2558 at 672 (1971). The protection of first amendment rights or the prevention of an improper award of punitive damages particularly justifies the application of the plain error rule. *Williams v. City of New York*, 508 F.2d 356, 362 (2d Cir. 1974); *Founding Church of Scientology v. United States*, 133 U.S.App.

D.C. 229, 409 F.2d 1146, 1164 n. 2, *cert. denied*, 396 U.S. 963, 90 S.Ct. 434, 24 L.Ed.2d 427 (1969).

In this case, however, upholding the award of punitive damages does not intrude on the defendant's first amendment rights. For the reasons stated in Part III of the court's opinion, I agree that the evidence shows that the defendant published the defamatory articles with knowledge that they were false or with reckless disregard of whether they were false or not. Since the award of punitive damages is supported by substantial evidence under the proper standard, we need not apply the plain error exception to Rule 51. *Cf. Beckley Newspapers Corp. v. Hanks*, 389 U.S. 81, 82, 88 S.Ct. 197, 19 L.Ed.2d 248 (1967).